STUDENT LOAN FUND OF IDAHO, INC., Plaintiff–Counter–Claim–Defendant–Appellee–Cross–Appellant,

v.

U.S. DEPARTMENT OF EDUCATION, Defendant–Appellant–Cross–Appellee,

and

Dr. Roderick R. Paige,* in his official capacity as Secretary of the United States Department of Education, Defendant–Counter–Claimant–Plaintiff–Appellant–Cross–Appellee.

Nos. 99–36035, 99–36078, 00–35310 and 00–35524.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 2001

Filed Dec. 4, 2001

---

* Dr. Roderick R. Paige is substituted for his predecessor, Richard W. Riley, as Secretary of the United States Department of Education. Fed R.App. P. 43(c)(2)

Rory R. Jones, Boise, Idaho, for the plaintiff-counter-claim-defendant-appellee-cross-appellant.

Howard S. Scher, Department of Justice, Washington, D.C., for the defendant-counter-plaintiff-appellant-appellee and defendant-appellant-cross-appellee.

Before: BROWNING, WALLACE, and T.G. NELSON, Circuit Judges.

WALLACE, Circuit Judge:

In this appeal, we are asked to interpret a difficult contract and attempt to divine what the Congress meant in portions of

the Higher Education Act (Act). The importance of the issues cannot be gainsaid, as they deal with loans to post-secondary students.

We suppose the complexity of the case is demonstrated by the fact that both parties appeal from the judgment of the district court. The Department of Education and Secretary of Education (together, Secretary) argue that the district court erred both in holding that the Secretary was in breach of his obligations to the Student Loan Fund of Idaho, Inc. (SLFI) and in interpreting the agreements entered between SLFI and the Secretary to allow the continuation of SLFI's guaranty operations even after SLFI terminated the agreements and ceased to guarantee new loans. In the alternative, the Secretary argues that even if SLFI had limited contractual authority to continue its operations, the Secretary has removed this authority by making a "best interest" determination. Finally, the Secretary argues that the district court failed to afford proper deference to the applicable regulations, promulgated pursuant to the Secretary's authority under the Act, in determining the Secretary's rights in SLFI's reserve fund assets.

In its cross-appeal, SLFI argues that the district court erred in requiring SLFI to hold a large portion of the awarded damages in a separate account to be used solely for paying its future obligations on guarantee claims, with any excess to be returned to the Secretary. In addition, SLFI argues that the district court abused its discretion in denying SLFI's motion to amend its complaint to include *Bivens* claims. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1082(a)(2). We have jurisdiction of the timely filed appeal and cross-appeal pursuant to 28 U.S.C. § 1291. We reverse and remand.

## I.

SLFI is a private non-profit corporation that began in the late 1970s to function as a guaranty agency under the Federal Family Education Loan Program (Loan Program), formerly known as the Guaranteed Student Loan Program. Under the Loan Program, private lenders provide financing to qualifying students attending post-secondary educational programs. The lenders enter into agreements with and pay insurance premiums to a guaranty agency which then guarantees repayment in case of default on the student loans. The ultimate insurer of the loans is, however, the federal government. 20 U.S.C. § 1082(*o*). The Act, 20 U.S.C. § 1070, et seq., and the regulations promulgated thereunder, 34 C.F.R. Part 682, govern the interaction between the federal government and the guaranty agencies.

The Act obligates the Secretary to provide reinsurance to the guaranty agencies during the life of the guaranteed loans. 20 U.S.C. § 1078(c)(1)(A). However, in order to ·become a guaranty agency within the meaning of the Loan Program and the Act, a State or private nonprofit organization is first required to contract with the Secretary. *See* 20 U.S.C. § 1085(j) (defining "guaranty agency" as "any State or nonprofit private institution or organization with which the Secretary has an agreement under section 1078(b) of this title."). At the time SLFI contracted with the Secretary (then Commissioner), the Secretary employed a series of standard regulatory agreements for bringing nonprofit entities into the Loan Program. *See, e.g., Colorado v. Cavazos,* 962 F.2d 968, 969 (10th Cir.1992) (describing the series of contracts); *Educ. Assist. Corp. v. Cavazos,* 902 F.2d 617, 619 (8th Cir.1990) (same). In large part, the provisions of the agreements either restate or implement the requirements of the regulations and the Act.

Four of the five agreements entered into between SLFI and the Secretary provide that SLFI is to comply with the Act and the regulations promulgated thereunder. All of the agreements state that they are to be interpreted in the light of the Act and the regulations. Two of the agreements—the reinsurance agreement and supplemental reinsurance agreement—set the rates at which SLFI may obtain reinsurance from the Secretary. The reinsurance agreement provides that the Secretary will reimburse 80% of the amounts expended by SLFI in discharging its insurance obligations "with respect to loans insured by [SLFI] prior to termination of [the] agreement or prior to the expiration of the [reinsurance] authority in the Act." The supplemental reinsurance agreement provides that if the default rate is 5% or less, the Secretary will reimburse 100% of SLFI's expenses. If the default rate is more than 5% but does not exceed 9%, then the Secretary reimburses 90% of expenses. These supplemental reinsurance rates apply only "with respect to loans insured by [SLFI] prior to the expiration of the [reinsurance] authority provided in the Act." These varying contractual rates of reinsurance track the rates then authorized by the regulations. *See* 34 C.F.R. § 682.404(a)(1) (1988); 34 C.F.R. § 682.405(a)(1) (1988).

The agreements, as well as the Act and regulations, require SLFI to maintain Loan Program funds in a "reserve fund." One of the agreements entered into between SLFI and the Secretary specifies that SLFI is required to deposit into a separate fund, called the Guarantee Fund by SLFI, (1) advances made by the Secretary, (2) sums appropriated by the State for the purposes of the Loan Program, (3) money received as loan insurance premiums, (4) amounts "received by [SLFI] through gift, grant, or by other means from other sources" for Loan Program operations, (5) money collected on default-ed loans, and (6) interest or other earnings derived from the investment of the previously listed sources of money. The regulations require that funds from these same sources are to be included in the "reserve fund." 34 C.F.R. § 682.410(a). The Act provides that the Secretary may require the return of the entire reserve fund of a guaranty agency only if "the Secretary [1] determines that such return is in the best interest of the operation of the program . . . or [2] to ensure [a] the proper maintenance of such agency's funds or assets or [b] the orderly termination of the guaranty agency's operations and the liquidation of its assets." 20 U.S.C. § 1072(g)(1).

The agreements between SLFI and the Secretary also provided for termination under certain circumstances with results disputed by the parties. It is now undisputed that SLFI invoked this termination provision in April of 1994 and terminated its regulatory agreements effective as of July 1, 1994. In the Secretary's view, upon the termination of the regulatory agreements SLFI ceased to be a guaranty agency within the meaning of the Act and, as a result, was required to yield control over all of its guaranty functions to the Secretary. Here, the Secretary attempted to exercise such control by repeatedly ordering SLFI to end its guaranty operations and to transfer its entire loan portfolio and all of its reserve funds and assets (which in the Secretary's view constitute federal property) to a successor guaranty agency, the Northwest Education Loan Association (NELA).

SLFI refused, however, to comply with the Secretary's directives, asserting that the only effect on its operations of the termination of the agreements was that it could not guarantee new loans. With the exception of $81,841, SLFI has not transferred any reserve fund assets to the Secretary or NELA since June 30, 1994. The

Secretary continued to reimburse SLFI until October 1994 at which time the Secretary instituted an offset against SLFI by withholding reimbursement payments. The Secretary suspended the offset during January and February of 1995 by making reimbursement payments in those months. However, since that time no other reimbursement payments have been made by the Secretary.

During September 1994, SLFI brought this action to challenge the legality of the Secretary's orders. The Secretary counterclaimed and, on a motion for summary judgment, ultimately obtained an injunction from the district court requiring SLFI to turn over all of its reserve fund. In the same order granting the injunction, the district court granted SLFI's motion to amend its complaint to include a breach of contract claim. However, the district court denied SLFI's motion to include *Bivens* claims against the Secretary in his official capacity and three other Department of Education officials.

SLFI appealed from the injunction, and we reversed, holding in an unpublished disposition that there was still a genuine issue of material fact as to whether the Secretary had met the statutory requirements for requiring the return of all reserve funds. *Student Loan Fund of Idaho v. Riley*, No. 95–36179 (unpublished; table at 107 F.3d 17). SLFI also attempted to gain review of the district court's denial of its motion to amend its complaint to include *Bivens* claims. However, we held that at that stage of the case we lacked jurisdiction over that issue because SLFI's entire action had not been dismissed, and none of the relevant exceptions applied.

While the prior appeal before us was pending, the Secretary sought to remove any doubt as to whether SLFI had terminated its agreements and instituted its own "for cause" termination of the agreements pursuant to 20 U.S.C. § 1078(c)(9)(E). Had the Secretary succeeded in his efforts to effect such a termination, the applicable statutes would have provided the Secretary with plenary power over SLFI's operations. 20 U.S.C. § 1078(c)(9)(F). SLFI challenged the Secretary's termination notice in an administrative proceeding and at that point conceded through a stipulation that it had already terminated the agreements in 1994. The hearing officer ruled that he did not have jurisdiction to determine the validity of the Secretary's attempt to invoke his power to terminate in light of SLFI's stipulation that the agreements were already terminated. In addition, following our prior decision in this case, the Secretary issued a "best interest" letter in an effort to meet one of the means specified in 20 U.S.C. § 1072(g)(1) for requiring the return of all of SLFI's reserve funds.

On remand from our court, the district court held a nine day trial on SLFI's breach of contract claim and determined that, as a matter of contract interpretation, SLFI had control upon termination of the agreements over whether to maintain its operations with respect to pre-termination loans. The district court agreed with the Secretary that SLFI is no longer a "guaranty agency" within the meaning of the Act, but it held that SLFI could continue operating as "a former guaranty agency, or private loan guarantor with existing obligations incurred under the [Loan Program]." One possible implication of this holding is that the Secretary cannot require the return of all SLFI's reserve fund assets on the basis that such return is necessary "to ensure ... the orderly termination of the guaranty agency's operations and the liquidation of its assets," 20 U.S.C. § 1072(g)(1), because SLFI has elected not to terminate its operations.

The district court also held it unnecessary to reach the question of whether the

Secretary could require the return of all reserve fund assets on the basis that the Secretary had "determine[d] that such return [was] in the best interest of the operation of the program," *id.*, because the district court found that SLFI no longer had any federal reserve funds to return to the Secretary. The district court agreed with the Secretary that monies received from the Student Loan Fund of Idaho Marketing Association (IMA), which operates a secondary market for student loans, would qualify under the regulations as reserve funds. IMA, because of its position in the secondary market for the loans, had a substantial interest in the operations of SLFI and infused capital-support fees and an additional $500,000–into SLFI in order to support its guaranty operations. The district court held, however, that the regulations were contrary to Congress's intent and that these funds from a separate, private entity should not be considered part of the federal reserve fund. In our prior opinion, the question of interpreting the termination provision of the agreements was not before us, and we expressly declined to reach the issue of to what extent the reserve fund could be deemed federal funds.

The district court determined that since SLFI was contractually authorized to continue its operations with respect to pre-termination loans, the Secretary was in breach of its reinsurance obligations to SLFI as to those loans. The court awarded $7,652,671 as reinsurance reimbursement for claims paid by SLFI with private money between November 1994 and March 1998. On appeal, the Secretary agrees that it owes reimbursement for this period since it would have had to pay reinsurance on the defaulted loans no matter who was insuring those loans; however, the Secretary disputes the amount. The court also awarded SLFI $8,502,832 as the present value of SLFI's projected insurance payments on its pre-termination loan portfolio for defaults occurring after March 1998. Finally, the court awarded SLFI $345,000 for damages based on lost business unrelated to SLFI's guaranty operations.

The Secretary filed a timely motion to amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). The district court granted the motion in part and amended the judgment to require SLFI to put the $8,502,832 into an escrow account to be used only for paying the insurance claims of lenders, with any remainder to be returned to the Secretary. The district court reasoned that SLFI "could receive a windfall if for example future default rates fall below the historical default rates which [SLFI's] expert employed in calculating [SLFI's] future damages." If the default rate were to drop, "[SLFI] would have guaranty money left over ... which rightfully belongs to the government."

## II.

■ SLFI argues, and the district court held, that upon SLFI's termination of the agreements between itself and the Secretary, the decision whether SLFI would continue operations with respect to pre-termination loans devolved upon SLFI, not the Secretary. The Secretary argues that this holding is inconsistent with the terms of the agreements, particularly because the agreements are to be read in the light of the Act, the regulations, and legislative policy. The Secretary asserts that upon SLFI's termination of the agreements, SLFI became obligated to relinquish to the Secretary all decision-making control with respect to SLFI's guaranty functions under the federal program. Here, the Secretary decided that SLFI should cease all guaranty operations and, as part of the "orderly termination of the guaranty agency's operations," also required the return of all reserve funds. 20 U.S.C.

§ 1072(g)(1). Thus, in the Secretary's view, it is SLFI that is in breach of its duties to the Secretary.

] The interpretation and meaning of contract provisions is a question of law that we review de novo. *See Mendler v. Winterland Prod. Ltd.*, 207 F.3d 1119, 1121 (9th Cir.2000). We apply federal law in interpreting the contractual provisions at issue because an agency of the United States is a party to the contract. *See Mohave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164, 1165 (9th Cir.2001). If we hold that SLFI was contractually required to cede decision-making control to the Secretary following the termination of its agreements with the Secretary, we will not need to reach the Secretary's alternative argument that it has made a best interest determination or the issues raised in SLFI's cross-appeal. We therefore discuss the Secretary's contractual argument first.

We begin with the language of the agreements which contains the following termination provision:

> This Agreement may be terminated by either party upon not less than 60 days written notice to the other party, except that the [Secretary] may terminate this Agreement only for cause. *Termination shall not affect obligations incurred under this Agreement by either party before the effective date of termination.* If termination is effected by the [Secretary], it will not become final until the Agency has been afforded reasonable notice and an opportunity for a hearing, except that the [Secretary] may suspend this Agreement pending the outcome of the hearing if he determines that such action is necessary in order to prevent substantial harm to the interests of the Federal Government.

(Emphasis added). SLFI argues that the language emphasized above means that termination of the agreement does not al-

ter obligations incurred before the termination. SLFI apparently reaches this result by equating the word "termination" with the phrase "effective date of termination" and positing that the prepositional phrase "before the effective date of termination" modifies the verb "incurred." According to SLFI, the implication of this interpretation is that SLFI may continue its operations essentially free of the Secretary's oversight and require the Secretary to provide reinsurance on pre-termination loans. Indeed, SLFI argues in its cross-appeal that the district court erred in exerting control over SLFI by requiring SLFI to hold the future damages award in a separate account to be used solely for the paying of defaulted loans, with any excess to be returned to the Secretary. Thus, SLFI asserts that its decision-making power over its present operations and funds should be virtually absolute now that it has withdrawn from its agreements with the Secretary.

The Secretary argues that the termination provision actually provides that obligations under the agreement are not altered until the termination is finalized, or "effective," at which time all obligations under the agreements cease. The Secretary refers to this as a "wrap-up" period. Thus, under this interpretation, the prepositional phrase "before the effective date of termination" would modify the verb "affect." The Secretary's interpretation is bolstered by the fact that the sentence immediately following the highlighted segment distinguishes between a termination and a final termination. According to the Secretary, once SLFI tendered its termination of the agreements, the Secretary had decision-making control as to how the wrap-up period would proceed and whether SLFI could continue limited operations thereafter.

■ Although we believe that the Secretary's reading is the more plausible of the two, the provision is not free from ambiguity. However, interpreting an ambiguous provision in a contract involving a federal agency is different from the same exercise when the contract involves private parties. In the instance before us, we attempt to resolve ambiguities by consulting the Act, the regulations, and the policies behind them. *Peterson v. United States Dept. of Interior*, 899 F.2d 799, 807 (9th Cir.1990) (holding that governmental contracts must "be interpreted against the backdrop of the legislative scheme that authorized them, and our interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation"). Indeed, in this case, we are required to do this by the agreements themselves.

■ First, SLFI was able to enter the Loan Program and receive the benefit of reinsurance only by agreeing to contract with the Secretary and submit to extensive federal regulation. 20 U.S.C. § 1085(j). Thus, guaranty agencies are essentially the creatures of regulatory agreements and federal regulations. As the Seventh Circuit has explained, "the guarantee agency ... is heavily regulated by federal law. The purpose and legal structure of [a guaranty agency] places it in that borderline between the wholly public and wholly private instrumentality. The extensive federal regulation of the agency suggests its highly public nature." *Great Lakes Higher Educ. Corp. v. Cavazos*, 911 F.2d 10, 14–15 (7th Cir.1990) (internal citation omitted). The court pointed out that "[i]n essence [a guaranty agency] is an intermediary between the United States and the lender of the student loan. The United States is the loan guarantor of last resort. [The guaranty agency] assists the United States in performing that function." *Id.* at 15. *See also Ohio Student Loan Comm'n v. Cavazos*, 900 F.2d 894, 899 (6th Cir.

1990) ("The [guaranty agency] is a public entity that is not interested in making any sort of profit in its administration of the [Loan Program]. Instead, it has chosen to join with the federal government to administer the [Loan Program]. . . .").

■ As the district court recognized, a guaranty agency without agreements with the Secretary is no longer a guaranty agency, but a "former guaranty agency, or private loan guarantor." While the district court did hold that SLFI remains under the "obligations imposed upon SLFI preparatory to receiving federal reimbursement," the district court provided no explanation as to how the Secretary is to exercise oversight over SLFI now that SLFI is no longer a party to any agreement with the Secretary. Further, SLFI now purports to operate largely outside the strictures of the Loan Program. This is emphasized by SLFI's contention that the district court erred in placing it under the obligation to use the damages award only to pay claims on defaulted student loans. Under the district court's decision, the federal government has thus lost its intermediary position between the lenders and itself with respect to the particular student loans guaranteed by SLFI prior to its having terminated its agreements. Yet the federal government remains the ultimate insurer of those loans, and the district court held that it must continue to pay reinsurance on those loans to SLFI, a "former guaranty agency or private loan guarantor," and not to NELA, the successor intermediary named by the Secretary and with whom the Secretary has Loan Program agreements.

This result is particularly striking when compared with the authority the Secretary would have had over SLFI if the Secretary had terminated the agreements "for cause." 20 U.S.C. § 1078(c)(9)(E) provides a list of determinations the Secretary

may make to effect the termination of its agreement with a guaranty agency:

The Secretary may terminate a guaranty agency's agreement ... if—

(i) a guaranty agency required to submit a management plan under this paragraph fails to submit a plan that is acceptable to the Secretary;

(ii) the Secretary determines that a guaranty agency has failed to improve substantially its administrative and financial condition;

(iii) the Secretary determines that the guaranty agency is in danger of financial collapse;

(iv) the Secretary determines that such action is necessary to protect the Federal fiscal interest;

(v) the Secretary determines that such action is necessary to ensure the continued availability of loans to student or parent borrowers; or

(vi) the Secretary determines that such action is necessary to ensure an orderly transition from the loan programs under this part to the direct student loan programs under part D of this title.

The termination provision of the agreements provides that the Secretary may only terminate "for cause." Reading that contractual requirement in light of the Act, it becomes clear that the Secretary would have cause to terminate if any of the conditions in 20 U.S.C. § 1078(c)(9)(E) were met.

If before SLFI had terminated the agreements the Secretary had terminated the agreements "for cause"-that is, under the conditions prescribed by the Act-then the Secretary's authority to control the functions of SLFI would have been absolute. The Act commands, "If a guaranty agency's agreement under this subsection is terminated pursuant to [20 .U.S.C. § 1078(c)(9)(E)] then the Secretary *shall assume responsibility for all functions of*

*the guaranty agency* under the loan insurance program of such agency." 20 U.S.C. § 1078(c)(9)(F) (emphasis added). In carrying out this responsibility, the Secretary may:

(i) permit the transfer of guarantees to another guaranty agency;

(ii) revoke the reinsurance agreement of the guaranty agency at a specified date, so as to require the merger, consolidation, or termination of the guaranty agency;

(iii) transfer guarantees to the Department of Education for the purpose of payment of such claims and process such claims using the claims standards of the guaranty agency, if such standards are determined by the Secretary to be in compliance with this chapter;

(iv) design and implement a plan to restore the guaranty agency's viability;

(v) provide the guaranty agency with additional advance funds....

(vi) use all funds and assets of the guaranty agency to assist in the activities undertaken in accordance with this subparagraph and take appropriate action to require the return, to the guaranty agency or the Secretary, of any funds or assets provided by the guaranty agency, under contract or otherwise, to any person or organization; or

(vii) take any other action the Secretary determines necessary to ensure the continued availability of loans made under this part to residents of the State or States in which the guaranty agency did business, the full honoring of all guarantees issued by the guaranty agency prior to the Secretary's assumption of the functions of such agency, and the proper servicing of loans guaranteed by the guaranty agency prior to the Secretary's assumption of the functions of such agency, to avoid disruption of the student loan program, and to ensure an

orderly transition from the loan programs under this part to the direct student loan programs under Part C of this subchapter.

*Id.* This list of powers clearly encompasses the directives issued by the Secretary in this case. However, as discussed above, the Secretary's attempt to invoke this provision was unavailing; an administrative hearing officer held that he was without jurisdiction to determine the validity of the Secretary's termination effort because the agreements had already been terminated by SLFI. Thus, SLFI's interpretation of the termination provision of the regulatory agreements allows a guaranty agency to circumvent the Secretary's power under 20 U.S.C. § 1078(c)(9)(F) by beating the Secretary to termination.

■ SLFI argues for its part that 20 U.S.C. § 1078(c)(1)(A) gives it the right to exact reinsurance from the Secretary. That provision states in part: "The guaranty agency shall be deemed to have a contractual right against the United States, during the life of such loan, to receive reimbursement . . . ." 20 U.S.C. § 1078(c)(1)(A). To read this provision as SLFI does would, however, abrogate the Secretary's right to transfer guarantees from a guaranty agency pursuant to 20 U.S.C. § 1078(c)(9)(F), discussed above. It would also abrogate its ability to require SLFI to assign loans to the Secretary pursuant to 20 U.S.C. § 1078(c)(8), which provides, "If the Secretary determines that the protection of the Federal fiscal interest so requires, a guaranty agency shall assign to the Secretary any loan of which it is the holder . . . ." The Secretary suggests that the contractual obligation imposed is an obligation that runs with the loans. That is, if a loan is transferred to a different guaranty agency, the successor agency becomes "[t]he guaranty agency" to which the Secretary is obligated to pay reinsurance under the statute. This interpretation harmonizes the various statutory

provisions allowing the Secretary to require the transfer of loans from a guaranty agency under certain conditions. The persuasiveness of the Secretary's position and the Secretary's expertise and long experience with the Loan Program leads us to accord a "fair measure of deference" to this interpretation. *See United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001), *citing Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

In addition, the Secretary's position is consistent with the language of the agreements it entered with SLFI. The reinsurance agreement provides: "The [Secretary]'s obligations to make payments, as provided for in this Agreement, shall extend only with respect to loans insured by the Agency prior to termination of this agreement or prior to the expiration of the [reinsurance] authority in the Act." The supplemental reinsurance agreement is similar: "The [Secretary's] obligation to make payments, as provided for in this Agreement, shall extend only with respect to loans insured by the Agency prior to the expiration of the [reinsurance] authority provided in the Act." In both cases, the obligations extend "with respect to loans" insured by SLFI and not with respect to SLFI. Nothing in these provisions indicate an intent on the part of the Secretary to give up his statutory authority to require SLFI to transfer its loan guarantees under certain conditions. Further, SLFI was on notice that it was subject to the regulations and the Act, and that the violation of such could give the Secretary cause to terminate the agreements and assume responsibility over SLFI's guaranty functions.

We hold that in light of the Act and the regulations, SLFI was required by the termination clause in the agreements entered between itself and the Secretary to

bow to the Secretary's directives once SLFI had terminated its agreements. To hold otherwise would be to give guaranty agencies, the servants of the federal government and of the public, the power to operate outside the Loan Program while still enjoying the benefits thereof. Therefore, the district court erred in holding that the Secretary breached its obligations to SLFI when SLFI had first breached its duties to the Secretary by continuing its guaranty operations without an agreement with the Secretary and in the face of clear directives to cease such operations. Because of this holding, it is unnecessary for us to discuss the Secretary's alternative "best interests" contention.

### III.

 However, one issue remains which we must address. The Secretary also argues that the district court should have included the support fees and $500,000 received by SLFI from IMA in calculating the amount in SLFI's "reserve fund." The district court held, and the parties do not dispute, that these monies fall within the regulatory definition of reserve fund assets. Thus, the only question before us is whether the district court correctly determined that the regulations are contrary to clear congressional intent and thus should not control. We answer this question because, although the Secretary has agreed that it is liable for reinsurance for the loans defaulting during the period between November 1994 and March 1998, the amount calculated by the district court may be incorrect as a result of its error in defining the scope of federal ownership in SLFI's funds and assets. Whether the district court properly interpreted federal statutes and regulations is a question of law we review de novo. *Tierney v. Kupers*, 128 F.3d 1310, 1311(9th Cir.1997).

 The Secretary has express authority to promulgate regulations under the Act. 20 U.S.C. § 1082(a)(1). In analyzing the regulations governing a guaranty agency's reserve funds, we therefore apply the framework outlined in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Mead Corp.*, 121 S.Ct. at 2171, 150 L.Ed.2d 292 ("When Congress has explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation, and any ensuing regulation is binding in the courts unless ... manifestly contrary to the statute." (internal quotation marks omitted)). Under this framework, we first must determine "whether Congress has directly spoken to the precise question at issue." *Rucker v. Davis*, 237 F.3d 1113, 1119 (9th Cir.2001) (en banc). To make this determination, "we employ the traditional tools of statutory construction; if Congress had an intent on this issue, that intent is the law and must be given effect." *Id.* These tools of construction require us first to engage in a textual analysis of the relevant statutory provisions and to read the words of a statute "in their context and with a view to their place in the overall statutory scheme." *Id.* (internal quotation marks omitted). If the proper interpretation is not clear from this textual analysis, "the legislative history offers valuable guidance and insight into Congressional intent." *Id.* However, "[i]t is well established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for enjoining regulations." *Rust v. Sullivan*, 500 U.S. 173, 189–90, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

The Secretary relies on 20 U.S.C. § 1072(g)(1) to establish that Congress has evinced an intent to allow the regula-

tory definition of "reserve fund" to control. Last amended in 1993, 20 U.S.C. § 1072(g)(1) provides: "Notwithstanding any other provision of law, the reserve funds of the guaranty agencies, and any assets purchased with such reserve funds, regardless of who holds or controls the reserves or assets, shall be considered to be the property of the United States . . . ." 20 U.S.C. § 1072(g)(1). As has been previously discussed, this provision also provides that "the return of all reserve funds of a guaranty agency" may only be required if [1] a best interest determination is made by the Secretary or "[2] to ensure [a] the proper maintenance of such agency's funds . . . or [b] the orderly termination of the guaranty agency's operations." *Id.* The plain import of this provision is that "reserve funds" belong to the federal government, and such reserve funds may be recalled in their entirety under certain conditions. In addition, the "[n]otwithstanding any other provision of law" clause demonstrates that Congress intended to supersede any previously enacted conflicting provisions. *See Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). This provision does not, however, provide a congressional definition for "reserve funds of a guaranty agency." Indeed, the Act nowhere defines the term "reserve funds."

The Secretary would have us infer from the absence of such a definition an intent on the part of Congress to allow the regulatory definition to control. The Secretary argues from two sources of evidence that had Congress intended to narrow the regulatory scope of "reserve funds" it would have done so explicitly. First, when 20 U.S.C. § 1072(g)(1) was amended in 1993, the regulations broadly defining such reserve funds were already well-established. *See* 57 Fed.Reg. 60,354–55 (Dec. 18, 1992); *Educ. Assist. Corp.,* 902 F.2d at 626 (1990 opinion explaining that under the regula-

tions a reserve fund includes "gifts or grants from other sources" used for Loan Program functions). Second, by the time Congress amended 20 U.S.C. § 1072(g)(1), all but one of the so-called spend-down cases had been decided. In these cases, our sister circuits addressed whether the federal government could require the return of "excess reserve funds," funds accumulated by the guaranty agencies in excess of that needed for Loan Program functions. In each case, it was held that the federal government could require the return of such funds. *See Colorado,* 962 F.2d at 971 (10th Cir.); *Rhode Island Higher Educ. Assistance Auth. v. Sec. U.S. Dept. Educ.,* 929 F.2d 844, 852 (1st Cir. 1991); *Great Lakes,* 911 F.2d at 14–15 (7th Cir.); *Educ. Assist. Corp.,* 902 F.2d at 626–27 (8th Cir.); *Ohio Student Loan Comm'n,* 900 F.2d at 899–900 (6th Cir.); *South Carolina State Educ. Assist. Auth. v. Cavazos,* 897 F.2d 1272, 1276 (4th Cir. 1990).

In several of these cases our sister circuits reached that result by reasoning that reserve fund assets did not constitute private property because of the extensive federal regulation over such assets and the notice provided to the agencies by the breadth of the regulations. *Great Lakes,* 911 F.2d at 14 ("Federal law regulates the reserve fund extensively and it exists because of a federal mandate."); *Educ. Assist. Corp.,* 902 F.2d at 626–27 ("A guaranty agency's 'reserve fund' is entirely a creature of federal regulation . . . . Because of the extensive federal regulation of [the guaranty agency's] reserve fund, we hold that [the guaranty agency] has no ownership interest in its reserve fund . . . ."); *South Carolina,* 897 F.2d at 1276 ("We agree that the regulations which completely control the reserve funds' uses are the sort of 'existing rules or understandings' which prevent any guaranty agencies from acquiring an own-

ership interest in its reserve fund ...."); *see also Delaware v. Cavazos*, 723 F.Supp. 234, 240 (D.Del.1989) ("This extensive regulation over the reserve fund precludes Delaware from claiming that the property in the fund is Delaware's private property."). In addition, in some of the spend-down cases, our sister circuits explicitly recognized that under the regulations the reserve fund of a guaranty agency could contain monies from non-federal or private sources; yet that recognition did not alter the holding that reserve fund assets belong to the federal government. *See Colorado*, 962 F.2d at 970 ("[G]uaranty agency reserve funds may be and frequently are comprised of federal, non-federal and even private funds."); *Ohio Student Loan Comm'n*, 900 F.2d at 897 (explaining that the particular guaranty agency also "takes in money from non-federal sources."); *see also Puerto Rico Higher Educ. Assist. Corp. v. Riley*, 10 F.3d 847, 850 (D.C.Cir. 1993) (holding that $9 million capital contribution from private parent corporation could be included in reserve fund because "Congress intended all reserve fund assets, regardless of their source, to factor into the Department's calculations of excess cash reserves") (decided Dec. 10, 1993, after adjournment of first session of 103rd Congress, which amended 20 U.S.C. § 1072(g)(1), *see* 1993 U.S.C.C.A.N. 1088).

While ascertaining congressional intent from Congress's failure to act is a difficult proposition, the Secretary has made a persuasive case for his position. Congress amended 20 U.S.C. § 1072(g)(1) just as the spend-down cases were coming to an end in the various federal appeals courts, and those cases applied the Secretary's broad regulatory definition of "reserve funds" in reaching their results. Further, in 20 U.S.C. § 1072(g)(1) Congress did place limits on when the Secretary could reach all of the reserve funds-e.g., after a best interest determination-which may have been a step taken in recognition that the spend-down cases could be broadly interpreted to allow the Secretary unfettered access to a guaranty agency's reserve funds.

SLFI points to the legislative history for 20 U.S.C. § 1072(g)(1) to argue for an alternative congressional intent. One sentence in the House conference report states, "It is the conferees further intention that all references to guaranty agencies reserves contained in amendments to section [1072] refer only to the 'Federal portion' of such reserves." H. Conf. Rep. No. 103–213, at 456 (1993), *reprinted in*, 1993 U.S.C.C.A.N. 1088, 1145. There is, however, no definition of "Federal portion" in the legislative history. While it is possible to infer that "Federal portion" means funds arising from federal sources, this would dramatically narrow the scope of the Secretary's regulations, essentially allowing only the recall of federal advances. *See* 34 C.F.R. § 682.410(a)(1). Further, to adopt SLFI's argument with respect to this bit of legislative history would render the first sentence of 20 U.S.C. § 1072(g)(1) largely superfluous, for it would serve little purpose to legislate that reserve funds belong to the United States if "reserve funds" already means only the "Federal portion." This snippet of legislative history may cast ambiguity on the statutory provision; it does not, however, constitute "clear and certain congressional intent." *Rust*, 500 U.S. at 190, 111 S.Ct. 1759.

SLFI also relies on 20 U.S.C. § 1072(a)(2) to argue that Congress intended to define "reserve funds" for purposes of 20 U.S.C. § 1072(g)(1) to exclude funds arising from private sources. As amended in 1992, 20 U.S.C. § 1072(a)(2) provides:

Matching Requirement.—No advance shall be made after June 30, 1968, unless matched by an equal amount from non-Federal sources. Such equal amount

may include the unencumbered non-Federal portion of a reserve fund. As used in the preceding sentence, the term "unencumbered non-Federal portion" means the amount (determined as of the time immediately preceding the making of the advance) of the reserve fund less the greater of—

(A) the sum of—

(i) advances made under this section prior to July 1, 1968;

(ii) an amount equal to twice the amount of advances made under this section after June 30, 1968, and before the advance for purposes of which the determination is made; and

(iii) the proceeds of earnings on advances made under this section; or

(B) any amount which is required to be maintained in such fund pursuant to State law or regulation, or by agreement with lenders, as a reserve against the insurance of outstanding loans.

Except as provided in section [1078(c)(10)(E) or (F)], such unencumbered non-Federal portion shall not be subject to recall, repayment, or recovery by the Secretary.

SLFI argues that the last sentence of this provision means that Congress has evinced a clear intent to prohibit the Secretary from including private-source funds in ascertaining SLFI's "reserve funds." Several considerations lead us to reject SLFI's argument. First, 20 U.S.C. § 1072(g)(1) was amended the year following the amendments to 20 U.S.C. § 1072(a)(2), and 20 U.S.C. § 1072(g)(1) provides that it applies "[n]otwithstanding any other provision of law." *See Cisneros*, 508 U.S. at 18, 113 S.Ct. 1898.

Second, 20 U.S.C. § 1072(a)(2) does not actually provide a definition of "reserve fund." Rather, it explains that within a reserve fund there may be something called an "unencumbered non-Federal por-

tion." In turn, the amount of the "unencumbered non-Federal portion" is defined only in terms of a specific formula which is applied "as of the time immediately preceding the making of the advance." 20 U.S.C. § 1072(a)(2). It is not clear from the text of the statute whether this "unencumbered non-Federal portion" is always present in the reserve fund, as asserted by SLFI, or whether it is only created upon application of the formula just prior to the receipt of a specific type of advance. Here, it is undisputed that SLFI never received the type of federal advance identified in this subsection.

Finally, even if 20 U.S.C. § 1072(a)(2) is applicable to SLFI, the reference to 20 U.S.C. § 1078(c)(10)(E) & (F) likely should be to 20 U.S.C. § 1078(c)(9)(E) & (F), because section 4107(a) of P.L. 103–66 (107 Stat. 368) strikes paragraph (9) of section 1078(c) and redesignates paragraph (10) as paragraph (9) of that section. As discussed above, 20 U.S.C. § 1078(c)(9)(E) & (F) are the provisions that the Secretary may utilize to terminate its agreements with a guaranty agency and gain control over a guaranty agency's functions. As so read, 20 U.S.C. § 1072(a)(2) provides that if the Secretary relies on the statutory procedures for termination, even the "unencumbered non-Federal portion" of a reserve fund is subject to recall. By implication, the entire reserve fund may be regarded as the property of the federal government, but the Secretary may require the entire fund, including the "unencumbered non-Federal portion," only under certain conditions. So interpreted, 20 U.S.C. § 1072(a)(2) is remarkably similar to 20 U.S.C. § 1072(g)(1), which explicitly provides that the reserve fund is the property of the United States, but that it may be required in its entirety only if certain specified conditions—e.g., best interest determination—are met.

While SLFI's arguments do serve to cloud congressional intent, they do not illuminate it. The Act simply does not explicitly define "reserve funds," and the Secretary has the express power to fill such gaps through the promulgation of regulations. SLFI has not established that Congress clearly intended to reject the broad regulatory definition in amending 20 U.S.C. § 1072(g)(1); at most, SLFI has shown that there is an ambiguity. However, that ambiguity is not for us to clarify; rather, we accord deference to the Secretary's regulations as required by *Chevron*. *See Mead Corp.*, 121 S.Ct. at 2175.

REVERSED AND REMANDED.