**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA STATE BOARD FOR CHARTER
SCHOOLS; EXCEL EDUCATION CENTERS,
INC., an Oregon corporation; PHOENIX
EDUCATION MANAGEMENT, LLC, a
Delaware limited liability company;
INTELLI-SCHOOL, INC., an Arizona
corporation; PAS CHARTER, INC., an
Arizona corporation; SC JENSEN
CORPORATION, INC., an Arizona
corporation; RSD CHARTER SCHOOL,
INC.,
                              *Plaintiffs-Appellants,*

                    and

LEONA GROUP ARIZONA, LLC, an
Arizona limited liability company;
GAR LLC, an Arizona limited
liability company; BRIGHT
BEGINNINGS SCHOOL, INC., an Arizona
corporation; OMBUDSMAN
EDUCATIONAL SERVICES, LTD., an
Illinois corporation; MONTESSORI
SCHOOLHOUSE OF TUCSON, INC., an
Arizona corporation,
                              *Plaintiffs,*

                    v.

U.S. DEPARTMENT OF EDUCATION;
MARGARET SPELLINGS, in her official
capacity as Secretary of the U.S.
Department of Education,
                              *Defendants-Appellees.*

No. 05-17349

D.C. No.
CV-05-01809-FJM

OPINION

11937

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
August 18, 2006—San Francisco, California

Filed September 25, 2006

Before: Michael Daly Hawkins and Sidney R. Thomas,
Circuit Judges, and Jeffrey T. Miller,* District Judge.

Opinion by Judge Hawkins

*The Honorable Jeffrey T. Miller, United States District Judge for the
Southern District of California, sitting by designation.

**COUNSEL**

William A. Richards, Arizona Office of the Attorney General, Phoenix, Arizona, for plaintiff-appellant Arizona State Board for Charter Schools.

David D. Garner, Phoenix, Arizona, for plaintiffs-appellants Charter Schools Excel Education Centers, Inc., Phoenix Education Management LLC, Intelli-School, Inc., PAS Charter, Inc., SC Jensen Corporation, Inc., and RSD Charter School, Inc.

Isaac J. Lidsky, Department of Justice, Civil Division, for the defendants-appellees.

**OPINION**

HAWKINS, Circuit Judge:

We face a question of statutory interpretation that boils down to the meaning of the word "including." The parties offer differing interpretations of two federal statutes that define the type of school eligible to receive specific federal funds as "a nonprofit institutional day or residential school, including a public [elementary or secondary] charter school, that provides [elementary or secondary] education, as determined under State law."[1] The district court, in a carefully written and thoughtful opinion, construed "including" to mean, essentially, "such as." Because this construction is consistent with the plain meaning of the language employed by Congress, the legislative history surrounding these provisions, and the reasonable interpretation given the language by the

---

[1]Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 (6), (27) (2004); Elementary and Secondary Education Act of 1965 ("ESEA"), 20 U.S.C. § 7801(18), (38) (2002).

agency Congress directed to supervise the distribution of the funds at issue, we affirm.

## I.    Background

### A.    Statutory Framework

The IDEA and the ESEA authorize the U.S. Department of Education ("Department") to distribute grants to the States through a state educational agency ("SEA"), such as the Arizona Department of Education ("ADE"). *See* 20 U.S.C. §§ 1411 (IDEA), 6332-33 (ESEA). The statutes further authorize an SEA to distribute the grant money through subgrants to a local educational agency ("LEA"), which is defined as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools . . . ." 20 U.S.C. §§ 1401(19)(A) (IDEA), 7801(26)(A) (ESEA).[2]

Under the IDEA and the ESEA, an "elementary school" is defined as "a *nonprofit* institutional day or residential school, including a public elementary charter school, that provides elementary education, as determined under State law." 20 U.S.C. §§ 1401(6) (IDEA), 7801(18) (ESEA) (emphasis added). Similarly, the statutes define a "secondary school" as "a *nonprofit* institutional day or residential school, including a public secondary charter school, that provides secondary education, as determined under State law . . . ." 20 U.S.C. §§ 1401(27) (IDEA), 7801(38) (ESEA) (emphasis added).

### B.    Procedural History

In 2003, the Department's Office of Inspector General

---

[2]Arizona considers entities that operate charter schools to be LEAs for purposes of receiving and administering funds under these federal programs.

audited the ADE's distribution of federal funds and concluded that the ADE had improperly awarded ESEA and IDEA funds to for-profit entities that operated charter schools in Arizona. After reviewing the ADE's response, the Department issued a final determination to resolve the audit. The Department found that the "definitions clearly provide that an elementary or secondary school must be non-profit," and interpreted the " 'including' clauses to be illustrative of eligible non-profit schools, not to contradict the requirement that they be non-profit." On this basis, the Department determined that Arizona's for-profit charter schools were ineligible for federal funding, concluding that their for-profit status precluded them from qualifying for subgrants as LEAs.

The Arizona State Board for Charter Schools and several for-profit charter school operators (jointly, "Arizona Charter Board") unsuccessfully petitioned the Department to reconsider its determination and subsequently sought review in district court. The district court determined that the statutes unambiguously "express[ ] the congressional mandate that in order to be eligible for federal funds, charter schools must be nonprofit," and that even if the statutes were ambiguous, the Department's construction was reasonable and entitled to *Chevron* deference. *Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 391 F. Supp. 2d 800, 804 (D. Ariz. 2005). This timely appeal followed.

## II.   Standard of Review

[1] We review both a district court's grant of summary judgment and questions of statutory interpretation de novo. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir. 1999); *Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 370 (9th Cir. 1999). When reviewing an agency's interpretation of a statute it is charged with administering, we look first "to the statutory text to see whether Congress has spoken directly to the question at hand. 'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress.' " *Contract Mgmt., Inc. v. Rumsfeld*, 434 F.3d 1145, 1146-47 (9th Cir. 2006) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). Thus, "[t]he language of a statute is controlling when the meaning is plain and unambiguous." *United States v. Maria-Gonzalez*, 268 F.3d 664, 668 (9th Cir. 2001).

Conversely, if the statute is uncertain or ambiguous, we "cannot simply impose our own construction." *United States v. Lopez-Perera*, 438 F.3d 932, 935 (9th Cir. 2006). Rather, under *Chevron*, we defer to the agency's interpretation if it is based on "a permissible construction of the statute." 467 U.S. at 843. However, interpretations embodied in opinion letters, policy statements, agency manuals, and enforcement guidelines — "all of which lack the force of law — do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Instead, such views are entitled to *Skidmore* deference "insofar as they 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Vigil v. Leavitt*, 381 F.3d 826, 835 (9th Cir. 2004) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In other words, " '[c]ogent administrative interpretations . . . not the products of formal rulemaking nevertheless warrant respect.' " *Id.* at 835 (quoting *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 488 (2004)). As the Supreme Court noted: "The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (footnotes omitted).

### III.  Discussion

### A.  Plain Meaning

We first evaluate whether the meaning of the statutes is plain and unambiguous and, therefore, controlling. *See Maria-*

*Gonzalez*, 268 F.3d at 668. To determine whether Congress has directly spoken to the issue, we "employ the traditional tools of statutory construction." *Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1165 (9th Cir. 2001) (internal quotation omitted). These tools of construction require us:

> first to engage in a textual analysis of the relevant statutory provisions and to read the words of a statute in their context and with a view to their place in the overall statutory scheme. If the proper interpretation is not clear from this textual analysis, the legislative history offers valuable guidance and insight into [c]ongressional intent. However, it is well established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for enjoining regulations.

*Id.* (citations and quotation marks omitted). In conducting this analysis, we are not vested with the power to rewrite the statutes, but rather must "construe what Congress has written. . . . It is for us to ascertain — neither to add nor to subtract, neither to delete nor to distort." *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951); *Xi v. INS*, 298 F.3d 832, 839 (9th Cir. 2002) ("[A] decision to rearrange or rewrite [a] statute falls within the legislative, not the judicial, prerogative.").

**[2]** Here, the meaning of the statutes is both plain and unambiguous. A natural reading establishes that only "non-profit institutional day or residential school[s]" are eligible for federal funding under the ESEA and the IDEA. Arizona Charter Board seeks to introduce an alternative interpretation, arguing that the subsequent term "including" expands, rather than simply illustrates, the definition of eligible schools. In both legal and common usage, the word "including" is ordinarily defined as a term of illustration, signifying that what follows is an example of the preceding principle. *See Fed.*

*Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.").[3] Using a common-sense construction of the statutes, the term "including" indicates that "public . . . charter school" is an illustrative subset of the preceding principle: "nonprofit" school. Thus, a natural reading of the text conveys clear congressional intent that all schools, including charter schools, must be nonprofit to receive IDEA and ESEA funds.

Arizona Charter Board urges that we interpret "including" to mean "and" or "in addition to" in order to reconcile conflicting terms. Specifically, they contend that the term "nonprofit . . . school" conflicts with "a public . . . charter school" because, under Arizona law, the latter includes both nonprofit and for-profit institutions. In such circumstances, Arizona Charter Board argues, courts have interpreted "including" broadly to be synonymous with "and." Such a reading, of course, would allow all for-profit public charter schools to receive funding, despite the preceding "nonprofit" requirement.

But well-accepted rules of statutory construction caution us that "statutory interpretations which would produce absurd results are to be avoided." *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004). When a natural reading of the statutes leads to a rational, common-sense result, an alteration of meaning is not only unnecessary, but also extrajudicial. *See Xi*, 298 F.3d at 839 (courts cannot rewrite a statute). Alternatively, courts avoid natural readings that would lead to irrational

---

[3]The *American Heritage Dictionary of the English Language* (4th ed. 2000), *available at* http://www.bartleby.com/reference, defines "include" as "[t]o take in as a part, element, or member[; t]o contain as a secondary or subordinate element[; t]o consider with or place into a group, class, or total." Similarly, *Black's Law Dictionary* defines it as "[t]o contain as a part of something[; t]he participle *including* typically indicates a partial list." 777-78 (8th ed. 2004).

results. *See, e.g.*, *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Serv., Inc.*, 435 F.3d 1140, 1146 (9th Cir. 2006) (replacing the word "less" with "more").

It is true that some courts have interpreted "including" to mean "and" or "in addition to," where the exclusivity of two or more terms requires a broader interpretation to avoid an irrational or absurd result. *See, e.g.*, *Adams v. Dole*, 927 F.2d 771, 777 (4th Cir. 1991) (explaining, by analogy: "If we say that 'all licensed drivers, including *applicants* for driver's licenses, shall take an eye exam,' the word 'including' means 'and' or 'in addition to' . . . [because] a 'licensed driver,' by definition, excludes an 'applicant,' and therefore if we intend to include applicants we must say so."); *Liverpool v. Baltimore Diamond Exch., Inc.,* 799 A.2d 1264, 1273-74 (Md. 2002). Here, the terms "nonprofit" and "public . . . charter school" do not require this alternative interpretation because their natural meaning is both rational and clear. Arizona's definition of the term "public . . . charter school" includes both nonprofit and for-profit charter schools. As a result, the term is neither mutually exclusive nor incompatible with the term "nonprofit." Instead, a logical and natural reading of the statutes indicates that the definition includes the subset of charter schools that complies with the preceding nonprofit principle, while excluding the subset that violates the nonprofit requirement.

**[3]** The alternative reading urged on us would replace a rational interpretation with one that is plainly counterintuitive: that the term "nonprofit" school somehow includes for-profit institutions. This interpretation would impute meaning not apparent from a natural reading of the text and essentially rewrite the statute to read, "a nonprofit . . . school, including a [for-profit] public . . . charter school." Given such an unnecessarily expansive result, absent more explicit guidance or indication from Congress, the natural reading of the statute — limiting funding to nonprofit charter schools — must control.

## B.  Legislative History

The legislative history validates the district court's interpretation. Originally, the definitions of "elementary" and "secondary" schools in the IDEA and the ESEA referred broadly to all "day or residential schools," but in the Improving America's Schools Act of 1994, Congress added the qualifying words "nonprofit" and "institutional" to the ESEA definitions. Pub. L. No. 103-382, 108 Stat. 3518, 3888, 3890 (1994).[4] Four years later, Congress again amended the ESEA definitions, inserting the term "including a public . . . charter school," but left the general nonprofit requirement intact. Charter School Expansion Act of 1998, Pub. L. No. 105-278, 112 Stat. 2682, 2689 (1998).[5]

The initial modification conveyed Congress's clear intent to exclude for-profit schools from IDEA and ESEA funding. The subsequent amendments adding "public . . . charter school" to the definitions did not purport to modify or eliminate this initial requirement. Because the "charter school" amendment postdated the "nonprofit" amendment, Congress had an opportunity to be explicit had it intended to alter the nonprofit provision. Without any such explication, the textual evolution affirms Congress's clear intent to prohibit the funding of for-profit schools, charter or otherwise.

[4] A closer inspection confirms this interpretation as the legislative history lacks any indication that Congress intended, through these amendments, to obviate the earlier-established "nonprofit" qualifier. The Charter School Expan-

---

[4]Congress made parallel changes to the IDEA definitions in 1997. IDEA Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37, 43, 45 (1997).

[5]Congress later amended the IDEA definitions as well, without any change to the "nonprofit" requirement. Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647, 2653, 2657 (2004).

sion Act of 1998, which first introduced the phrase "including a public . . . charter school," sought to "expand[ ] the number of high-quality charter schools available to students across the Nation." Pub. L. No. 105-278, 112 Stat. at 2682 (amending the "Purpose" Section of the ESEA). The plain meaning of the statutes, barring for-profit charter schools from federal funding, is wholly consistent with this purpose; ensuring that nonprofit charter schools receive ESEA and IDEA funds markedly assists the nationwide expansion of charter schools. Further, the for-profit prohibition conforms with contemporary education funding as nearly half of states with charter school laws either prohibit for-profit entities from applying for a charter or prevent them from operating or managing a charter school.

Additionally, the natural reading of the statutes appears consistent with the report from the congressional committee that produced the initial Charter School Expansion Act. In its report, the House Committee on Education and the Workforce noted "that there is nothing in the statute that prohibits charter schools from contracting with for-profit companies to manage the operations of a charter school. The Department currently does not prohibit charter schools who contract out specific services with for-profit organizations from receiving Federal dollars." H.R. Rep. No. 105-321, 1997 WL 638575, at *19 (1997). Recognition of this contract alternative evinces congressional understanding that the "nonprofit" requirement constrained the added term "including a public . . . charter school." If Congress believed that the "charter school" amendment had rendered the nonprofit requirement moot (as it applied to charter schools), then there was no need to acknowledge this end-around: if for-profit charter schools were eligible for funding, then it would not be noteworthy that charters schools could also contract with for-profit companies and still receive funding.

[5] Ultimately, the purpose of the "charter school" amendments — to assist charter schools — is advanced, not contra-

dicted, by the plain meaning of the statute as nonprofit charter schools are assured appropriate funding. Because an interpretation that prohibits funding to for-profit charter schools is not only apparent from a natural reading of the text, but also consistent with the legislative purpose and history of the statutes, we hold that Arizona's for-profit charter schools are excluded from ESEA and IDEA funding.

## C.   Department Deference

Even if we held the statutory language to be ambiguous, we would still reach the same result because the Department's interpretation is reasonable and entitled to deference. As the Supreme Court noted in *Chevron*, "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." *Chevron*, 467 U.S. at 844. We need not decide, however, whether the Department's interpretation is entitled to *Chevron* deference, or the lesser *Skidmore* deference, because "the result in the present case would be the same under any standard of deference." *Vigil*, 381 F.3d at 835.

## IV.   Conclusion

Because the district court's construction is consistent with the plain meaning of the text, the legislative history, and the Department's reasonable interpretation, we affirm.

**AFFIRMED.**