**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DRAKES BAY OYSTER COMPANY;
KEVIN LUNNY,
        *Plaintiffs-Appellants*,

v.

SALLY JEWELL, in her official
capacity as Secretary, U.S.
Department of the Interior; U.S.
DEPARTMENT OF THE INTERIOR; U.S.
NATIONAL PARK SERVICE;
JONATHAN B. JARVIS, in his official
capacity as Director, U.S. National
Park Service,
        *Defendants-Appellees*.

No. 13-15227

D.C. No.
4:12-cv-06134-
YGR

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted
May 14, 2013—San Francisco, California

Filed September 3, 2013
Amended January 14, 2014

Before: M. Margaret McKeown and Paul J. Watford,
Circuit Judges, and Algenon L. Marbley, District Judge.[*]

Opinion by Judge McKeown;
Dissent by Judge Watford

---

## SUMMARY[**]

### Environmental Law / Preliminary Injunction

The panel affirmed the district court's order denying a preliminary injunction challenging the Secretary of the Interior's discretionary decision to let Drakes Bay Oyster Company's permit for commercial oyster farming at Point Reyes National Seashore expire on its own terms.

Drakes Bay sought a preliminary injunction, arguing that the Secretary's decision to let the permit expire violated the authorization in the Department of the Interior Appropriations Act ("Section 124"), the National Environmental Policy Act, and various federal regulations. The panel held that it had jurisdiction to review whether the Secretary violated any legal mandate contained in Section 124 or elsewhere, but that it lacked jurisdiction to review the Secretary's ultimate discretionary decision whether to issue a new permit. The panel held that Drakes Bay was not likely to succeed in

---

[*] The Honorable Algenon L. Marbley, District Judge for the U.S. District Court for the Southern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

proving that the Secretary violated constitutional, statutory, regulatory, or other legal mandates or restrictions. The panel further held that Drakes Bay was not entitled to a preliminary injunction not only because it failed to raise a serious question about the Secretary's decision, but also because it had not shown that the balance of equities weighed in its favor.

Judge Watford dissented because he would hold that Drakes Bay was likely to prevail on its claim that the Secretary's decision was arbitrary, capricious, or otherwise not in accordance with law. Judge Watford would hold that injunctive relief preserving the status quo should have been granted.

## COUNSEL

Amber D. Abbasi (argued), Cause of Action, Washington, D.C.; John Briscoe, Lawrence S. Bazel, and Peter S. Prows, Briscoe Ivester & Bazel LLP, San Francisco, California; S. Wayne Rosenbaum and Ryan Waterman, Stoel Rives LLP, San Diego, California; Zachary Walton, SSL Law Firm LLP, San Francisco, California, for Plaintiffs-Appellants.

J. David Gunter II (argued) Trial Attorney, United States Department of Justice, Washington, D.C.; Ignacia S. Moreno, Assistant Attorney General, Stephen M. Macfarlane, Joseph T. Mathews, E. Barrett Atwood, and Charles Shockey, Trial Attorneys, United States Department of Justice, Sacramento, California, for Defendants-Appellees.

Judith L. Teichman, San Francisco, California, for Amici Curiae Alice Waters, Tomales Bay Oyster Company, Hayes Street Grill, Marin County Agricultural Commissioner, Stacy Carlsen, the California Farm Bureau Federation, the Marin County Farm Bureau, the Sonoma County Farm Bureau, Food Democracy Now, Marin Organic, and the Alliance For Local Sustainable Agriculture.

Trent W. Orr and George M. Torgun, Earthjustice, San Francisco, California, for Amici Curiae Environmental Action Committee of West Marin, National Parks Conservation Association, Natural Resources Defense Council, Save Our Seashore, and the Coalition of National Park Service Retirees.

---

### ORDER

The opinion filed on September 3, 2013, appearing at 729 F.3d 967, is hereby amended. An amended opinion is filed concurrently with this order.

With these amendments, Judge McKeown voted to deny the petition for rehearing en banc and Judge Marbley so recommends. Judge Watford voted to grant the petition.

Amicus Curiae Catherine Rucker's request for judicial notice in support of her brief opposing the petition for rehearing en banc is **DENIED**.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc is **DENIED**. No further petitions for en banc or panel rehearing shall be permitted.

---

**OPINION**

McKEOWN, Circuit Judge:

This appeal, which pits an oyster farm, oyster lovers and well-known "foodies" against environmentalists aligned with the federal government, has generated considerable attention in the San Francisco Bay area.[1] Drakes Bay Oyster Company ("Drakes Bay") challenges the Secretary of the Interior's discretionary decision to let Drakes Bay's permit for commercial oyster farming expire according to its terms. The permit, which allowed farming within Point Reyes National Seashore, was set to lapse in November 2012. Drakes Bay requested an extension pursuant to a Congressional enactment that provided, in relevant part, "notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization." Department of the Interior

---

[1] The panel appreciates the amicus briefing filed by supporters of both sides. Alice Waters, Tomales Bay Oyster Company, Hayes Street Grill, the California Farm Bureau Federation, the Marin County Farm Bureau, the Sonoma County Farm Bureau, Food Democracy Now, Marin Organic, and the Alliance For Local Sustainable Agriculture filed an amici curiae brief in support of Drakes Bay. The Environmental Action Committee of West Marin, National Parks Conservation Association, Natural Resources Defense Council, Save Our Seashore, and the Coalition of National Park Service Retirees filed an amici curiae brief in support of the federal parties.

Appropriations Act, Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932 (2009) ("Section 124"). After the Secretary declined to extend the permit, Drakes Bay sought a preliminary injunction, arguing that the Secretary's decision violated the authorization in Section 124, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and various federal regulations.

We have jurisdiction to consider whether the Secretary violated "constitutional, statutory, regulatory or other legal mandates or restrictions," *Ness Inv. Corp. v. U.S. Dep't of Agr., Forest Serv.*, 512 F.2d 706, 715 (9th Cir. 1975), and we agree with the district court that Drakes Bay is not likely to succeed in proving any such violations here. Through Section 124, Congress authorized, but did not require, the Secretary to extend the permit. Congress left the decision to grant or deny an extension to the Secretary's discretion, without imposing any mandatory considerations. The Secretary clearly understood he was authorized to issue the permit; he did not misinterpret the scope of his discretion under Section 124. In an effort to inform his decision, the Secretary undertook a NEPA review, although he believed he was not obligated to do so. Nonetheless, any asserted errors in the NEPA review were harmless.

Because Congress committed the substance of the Secretary's decision to his discretion, we cannot review "the making of an informed judgment by the agency." *Id.* In letting the permit lapse, the Secretary emphasized the importance of the long-term environmental impact of the decision on Drakes Estero, which is located in an area designated as potential wilderness. He also underscored that, when Drakes Bay purchased the property in 2005, it did so with eyes wide open to the fact that the permit acquired from

its predecessor owner was set to expire just seven years later, in 2012. Drakes Bay's disagreement with the value judgments made by the Secretary is not a legitimate basis on which to set aside the decision. Once we determine, as we have, that the Secretary did not violate any statutory mandate, it is not our province to intercede in his discretionary decision. We, therefore, affirm the district court's order denying a preliminary injunction.

## BACKGROUND

### I.  THE POINT REYES NATIONAL SEASHORE

Congress established the Point Reyes National Seashore ("Point Reyes") in 1962 "in order to save and preserve, for purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped." Act of Sept. 13, 1962, Pub. L. No. 87-657, 76 Stat. 538, 538. The area is located in Marin County, California, and exhibits exceptional biodiversity. Point Reyes is home to Drakes Estero, a series of estuarial bays.

The enabling legislation for Point Reyes gave the Secretary of the Interior administrative authority over the area and directed him to acquire lands, waters, and other property and interests within the seashore. *Id.* at § 3(a), 76 Stat. at 539–40. In 1965, the State of California conveyed to the United States "all of the tide and submerged lands or other lands" within Point Reyes, reserving certain minerals rights to itself and reserving the right to fish to Californians. 1965 Cal. Stat. 2604–2605, § 1–3.

In the Point Reyes Wilderness Act of 1976, Congress designated certain areas within the seashore as "wilderness" under the Wilderness Act of 1964. Pub. L. No. 94–544, 90 Stat. 2515. The Wilderness Act "established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as 'wilderness areas.'" 16 U.S.C. § 1131(a). Such areas are to "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas [and] the preservation of their wilderness character." *Id.* Accordingly, subject to statutory exceptions and existing private rights, the Act provides that "there shall be no commercial enterprise . . . within any wilderness area." 16 U.S.C. § 1133(c).

The Point Reyes Wilderness Act designated other areas, including Drakes Estero, as "potential wilderness." Pub. L. No. 94–544, 90 Stat. 2515. Congress considered designating Drakes Estero as "wilderness," but declined to do so. The legislative history reflects that Congress took into account the Department of the Interior's position that commercial oyster farming operations taking place in Drakes Estero, as well as California's reserved rights and special use permits relating to the pastoral zone, rendered the area "inconsistent with wilderness" at the time. H.R. Rep. No. 94-1680, at 5–6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5593, 5597. Congress specified in separate legislation that the "potential wilderness additions" in Point Reyes "shall . . . be designated wilderness" by "publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act . . . have ceased." Act of Oct. 20, 1976, Pub. L. No. 94-567, § 3, 90 Stat. 2692.

## II.  DRAKES BAY OYSTER COMPANY'S OPERATIONS

Oyster farming has a long history in Drakes Estero, dating to the 1930s.  Charles Johnson started the Johnson Oyster Company in Drakes Estero in the 1950s.  His oyster farm was in operation on a five-acre parcel of land on the shore of the estero when Congress created the Point Reyes National Seashore.  In 1972, Johnson sold his five acres to the United States, electing to retain a forty-year reservation of use and occupancy ("RUO").  The RUO provided that, "[u]pon expiration of the reserved term, a special use permit *may* be issued for the continued occupancy of the property for the herein described purposes." (Emphasis added.)  It added that, "[a]ny permit for continued use will be issued in accordance with National Park Service ["NPS"] regulations in effect at the time the reservation expires."  In late 2004, Drakes Bay agreed to purchase the assets of the Johnson Oyster Company.  The RUO was transferred along with the purchase.  The forty-year RUO ended on November 30, 2012.

When it purchased the farm, Drakes Bay was well aware that the reservation would expire in 2012, and received multiple confirmations of this limitation.  The acquisition documents specifically referenced "that certain Reservation of Possession Lease dated 10/12/1972, entered into by Seller and the National Park Service."  In January 2005, the National Park Service wrote to Kevin Lunny, an owner of Drakes Bay, highlighting "the issue of the potential wilderness designation."  The Park Service told Lunny that it wanted to make sure he was aware of the Interior Department's legal position "[b]efore [he] closed escrow on the purchase" of Johnson's farm.  The Park Service accordingly sent Lunny a memorandum from the Department's Solicitor.  Notably, the Solicitor disagreed with

the proposition previously expressed in the House Report accompanying the Point Reyes Wilderness Act that California's retained fishing and mineral rights were inconsistent with wilderness designation. The Solicitor concluded, "the Park Service is mandated by the Wilderness Act, the Point Reyes Wilderness Act and its Management Policies to convert potential wilderness, i.e. the Johnson Oyster Company tract and the adjoining Estero, to wilderness status as soon as the non conforming use can be eliminated." In March 2005, the Park Service reiterated its guidance regarding the Drakes Bay's purchase of the Johnson property. It specifically informed Lunny, "Regarding the 2012 expiration date and the potential wilderness, based on our legal review, no new permits will be issued after that date."

## III.    SECTION 124 AND THE SECRETARY'S DECISION

Several years later, in 2009, Congress addressed the Department of the Interior's authority to issue Drakes Bay a new permit in appropriations legislation. The Senate appropriations committee proposed a provision requiring the Secretary to issue a special use permit for an additional ten years. H.R. 2996, 111th Cong. § 120(a) (as reported in Senate, July 7, 2009) (providing "the Secretary of the Interior *shall* extend the existing authorization . . .") (emphasis added). The Senate rejected this mandate, and amended the language to provide that the Secretary "is authorized to issue" the permit, rather than required to do so. 155 Cong. Rec. S9769-03, S9773 (daily ed. Sept. 24, 2009).

The law as enacted provides:

> Prior to the expiration on November 30, 2012 of the Drakes Bay Oyster Company's

Reservation of Use and Occupancy and associated special use permit ("existing authorization") within Drakes Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit with the same terms and conditions as the existing authorization, except as provided herein, for a period of 10 years from November 30, 2012. *Provided*, That such extended authorization is subject to annual payments to the United States based on the fair market value of the use of the Federal property for the duration of such renewal. The Secretary shall take into consideration recommendations of the National Academy of Sciences ["NAS"] Report pertaining to shellfish mariculture in Point Reyes National Seashore before modifying any terms and conditions of the extended authorization. Nothing in this section shall be construed to have any application to any location other than Point Reyes National Seashore; nor shall anything in this section be cited as precedent for management of any potential wilderness outside the Seashore.

123 Stat. at 2932. The House Conference Report reflected that the final language "provid[ed] the Secretary *discretion* to issue a special use permit. . . ." 155 Cong. Rec. H11871-06 (daily ed. October 28, 2009) (emphasis added).

The NAS report that Section 124 referenced, "Shellfish Mariculture in Drakes Estero, Point Reyes National Seashore,

California," was prepared in 2009, in light of "the approach of the 2012 expiration date" of the permit, in order "to help clarify the scientific issues raised with regard to the shellfish mariculture activities in Drakes Estero." The report highlighted that there was "limited scientific literature" available and that there was evidence that oyster farming had both negative and positive effects on the environment. The report explained: "The ultimate decision to permit or prohibit shellfish farming in Drakes Estero necessarily requires value judgments and tradeoffs that can be informed, but not resolved, by science."

Drakes Bay sent letters to the Secretary in July 2010 requesting that he exercise his authority under Section 124 to issue a permit extension. Park Service staff met with Lunny soon after to discuss a draft schedule to complete a NEPA process. The Department, through the Park Service, then formally began to prepare an Environmental Impact Statement ("EIS") in an effort "to engage the public and evaluate the effects of continuing the commercial operation within the national seashore" and " to inform the decision of whether a new special use permit should be issued." Drakes Bay Oyster Company Special Use Permit, 75 Fed. Reg. 65,373 (Oct. 22, 2010).[2]

The Park Service issued a draft EIS ("DEIS") for public comment in September 2011. Drakes Bay submitted

---

[2] In the final EIS, the Department stated that Section 124 did not require compliance with NEPA because that provision gave the Secretary authorization to make the permit decision "notwithstanding any other provision of law." Nevertheless, the Department "determined that it is helpful to generally follow the procedures of NEPA." The Secretary reiterated this position in his decision.

comments criticizing much of the draft, along with a data quality complaint.[3] Congress expressed "concerns relating to the validity of the science underlying the DEIS" and therefore "direct[ed] the National Academy of Sciences to assess the data, analysis, and conclusions in the DEIS in order to ensure there is a solid scientific foundation for the Final Environmental Impact Statement expected in mid-2012." H.R. Conf. Rep. No. 112-331, at 1057 (Dec. 15, 2011), *reprinted in* 2011 U.S.C.C.A.N. 605, 788.

The NAS released its report in August 2012. The report noted several instances where the DEIS "lack[ed] assessment of the level of uncertainty associated with the scientific information on which conclusions were based." But the report concluded that the available research did not admit of certainty:

> The scientific literature on Drakes Estero is not extensive and research on the potential impacts of shellfish mariculture on the Estero is even sparser . . . . Consequently, for most of the resource categories the committee found that there is a moderate or high level of uncertainty associated with impact assessments in the DEIS.

The final EIS, issued on November 20, 2012, responded to the NAS review. The EIS revised the definitions of the intensity of impacts to wildlife and wildlife habitats, clarified the assumptions underlying those conclusions, and added discussion of the uncertainty of scientific data.

---

[3] Drakes Bay's data quality complaint is not before us in this appeal.

The Secretary issued his decision on November 29, 2012, directing the Park Service to let the permit expire according to its terms. He explained that his decision was "based on matters of law and policy," including the "explicit terms of the 1972 conveyance from the Johnson Oyster Company to the United States" and "the policies of NPS concerning commercial use within a unit of the National Park System and nonconforming uses within potential or designated wilderness, as well as specific wilderness legislation for Point Reyes National Seashore." He recognized that Section 124 "grant[ed] [him] the authority to issue a new SUP," but elected to effectuate Park Service policies and the principles he discerned in wilderness legislation.

In his decision, the Secretary recognized the "scientific uncertainty" and "lack of consensus in the record regarding the precise nature and scope of the impacts that [Drakes Bay's] operations have" on wilderness and other resources. Generally, he found that the impact statements supported the proposition that letting the permit expire "would result in long-term beneficial impacts to the estero's natural environment." But he explained that the draft and final EIS were "not material to the legal and policy factors that provide the central basis" for his decision, though they were "helpful" in that they informed him regarding the "complexities, subtleties, and uncertainties of this matter." He disclaimed reliance on "the data that was asserted to be flawed," and noted that his decision was "based on the incompatibility of commercial activities in wilderness."

In accordance with his decision, the Secretary directed the Park Service to publish a notice in the Federal Register announcing the conversion of Drakes Estero from potential to designated wilderness. This litigation followed. Drakes Bay

sued the Secretary, seeking a declaratory judgment that his decision violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, an order that the Secretary direct the Park Service to issue a new ten-year permit, and, alternatively, an order vacating and remanding for a new decision. Drakes Bay moved for a preliminary injunction to avoid having to cease its operations pending suit, as it had been given ninety days to remove its property from the estero.

The district court determined that it did not have jurisdiction to review the Secretary's decision because "the statutory context affords complete discretion" and "Section 124 provides the Court with 'no meaningful standard' for the Court to apply in reviewing the Decision not to issue a New SUP." The court went on to provide an alternate rationale for denial: "the Court does not find that Plaintiffs can show a likelihood of success under a Section 706(2) standard [arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA]." Finally, the court held that "[o]n balance, and combining the requirement of both the equities and the public interest more broadly, the Court does not find these elements weigh in favor of granting a preliminary injunction."[4]

---

[4] A motions panel granted Drakes Bay's emergency motion for an injunction pending appeal "because there are serious legal questions and the balance of hardships tips sharply in appellants' favor." With the benefit of full briefing and argument, we need not defer to the motion panel's necessarily expedited decision. *United States v. Houser*, 804 F.2d 565, 568 (9th Cir. 1986).

ANALYSIS

## I. JURISDICTION AND THE SCOPE OF THE "NOTWITHSTANDING" CLAUSE

As a threshold matter, we address jurisdiction. On this point, we disagree in part with the district court. *See Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 979 n.1 (9th Cir. 2006) (reviewing de novo the question of subject matter jurisdiction under the APA). We do have jurisdiction to review whether the Secretary violated any legal mandate contained in Section 124 or elsewhere. However, we agree with the district court that we lack jurisdiction to review the Secretary's ultimate discretionary decision whether to issue a new permit.

The government argues that we lack jurisdiction to review any of Drakes Bay's claims because, under Section 124, the Secretary's decision was "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This narrow exception to the presumption of judicial review of agency action under the APA applies "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see also Webster v. Doe*, 486 U.S. 592, 599 (1988) (characterizing the exception as for circumstances where there is "no law to apply") (internal quotation marks and citation omitted). But even where the substance or result of a decision is committed fully to an agency's discretion, "a federal court has jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of constitutional, statutory, regulatory or other legal mandates or restrictions." *Ness Inv. Corp.*, 512 F.2d at 715. In such

circumstances, a federal court lacks only jurisdiction to review an alleged abuse of discretion regarding "the making of an informed judgment by the agency." *Id.*

Here, as in *Ness Inv. Corp.*, "[t]he secretary is 'authorized,' not required, to issue" a permit, and there are "no statutory restrictions or definitions prescribing precise qualifications" for issuance. *Id.*  Consequently we may review only whether the Secretary followed whatever legal restrictions applied to his decision-making process.  The parties agree that the *Ness* framework applies, but disagree on whether any "mandates or restrictions," *id.*, exist.  Drakes Bay interprets Section 124, NEPA, and various federal regulations as imposing legal restrictions on the Secretary, but it contends that these requirements apply only to a decision to deny an extension, not to a decision granting an extension.  The Secretary contends that the "notwithstanding" clause of Section 124 sweeps away any statutes and regulations that might otherwise apply to a permit application.  Neither side has it quite right.

As a general matter, "notwithstanding" clauses nullify *conflicting* provisions of law.  *See United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) ("The Supreme Court has indicated as a general proposition that statutory 'notwithstanding' clauses broadly sweep aside potentially conflicting laws.").  Before Congress passed Section 124, the Department's Solicitor had issued a series of opinions holding that the Wilderness Act, the Point Reyes Wilderness Act, and Park Service management policies legally prohibited any extension of the permit.  Section 124's "notwithstanding" clause trumps any law that purports to prohibit or preclude the Secretary from extending the permit, as such a law would "conflict" with Section 124's authorization.  Thus we may

review whether the Secretary misunderstood his authority to issue a permit and the closely related question of whether he mistakenly interpreted other statutory provisions as placing a legal restriction on his authority. As the government itself acknowledges, if Section 124 provides restrictions on the Secretary's exercise of discretion, then we have jurisdiction to review compliance with those limits.

The Secretary's decision is also subject to applicable procedural constraints. "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Thus, we have jurisdiction to consider the applicability of NEPA and other procedures that do not conflict with the authorization in Section 124.

Procedural constraints that do not conflict with the authorization would apply to the Secretary's decision regardless of whether he granted or denied the permit. We reject Drakes Bay's anomalous position that the Secretary had "unfettered authority to issue the permit," while his "discretion to deny [Drakes Bay] a [permit] [was] bounded by NEPA and other applicable law." Drakes Bay points to the fact that Section 124 says that "notwithstanding any other provision of law, the Secretary of the Interior is authorized *to issue* a special use permit," rather than that he is authorized to "issue *or deny*" one. From that language, Drakes Bay extrapolates that Section 124 "was enacted to make it easy to issue the permit." The statute does not dictate such a one-way ratchet. Indeed, if Congress had so wanted to make it easy or automatic for Drakes Bay, one wonders why it rejected the proposal that would have simply required the Secretary to issue a new permit. The ultimate legislation was a move away from, not toward, Drakes Bay's favored result.

A natural reading of the authorization to issue a permit implies authorization not to issue one, and we see no reason to interpret the "notwithstanding" clause as applying to one outcome but not the other. *See Confederated Salish and Kootenai Tribes v. United States*, 343 F.3d 1193, 1196–97 (9th Cir. 2003) (interpreting the word "authorized" to mean both the power to grant or deny a request for the Secretary to take land in trust for a tribe). Section 124 was enacted as part of appropriations legislation, granting the Secretary authority to act, without providing any statement of Congress's view on that decision one way or the other.

Drakes Bay's effort to read into this short appropriations provision a preference for issuance of the permit is unavailing, as is the dissent's attempt to do so based on legislative history from decades earlier. The dissent misunderstands the significance of the legislative history of the Point Reyes Wilderness Act of 1976, which focuses on the notion that Congress at that time viewed oyster farming as desirable and consistent with wilderness designation.

The dissent stacks legislative history from one enactment to another, over decades, when Section 124 itself does not make the link. "Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the *enacting Legislature's* understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (emphasis added). Regardless of the accuracy of the dissent's recitation of the legislative history of the 1976 Act, the dissent's citation to congressional statements in support of designating Drakes Estero as wilderness in 1976 do not reliably reflect that the Congress that enacted Section 124 was of the dissent's view that Drakes Bay's operations were "not an 'obstacle' to

converting Drakes Estero to wilderness status." Dissent at
46. The dissent's position would rewrite the clause to
something like "notwithstanding the Department's policy
view that oyster farming can be incompatible with wilderness
designation." The dissent cites nothing from the text, or even
the legislative history, of *Section 124* to support this
interpretation. Even Drakes Bay did not argue this position
or urge us to go this far afield.[5]

Here, where Section 124 merely grants *authority* to take
an action, the "notwithstanding" clause targets laws that
"potentially conflict[]" *with that authority*. *Novak*, 476 F.3d
at 1046. Given the Department's opinions in 2005 that
wilderness legislation prevented any exercise of authority to
extend the permit, the notwithstanding clause has a clear
function—to convey that prior legislation should not be
deemed a legal barrier.[6] The dissent confuses actual or

---

[5] The dissent's conclusion that "[c]ontinued operation of the oyster farm
is fully consistent with the Wilderness Act," Dissent at 46, is particularly
puzzling given that Drakes Bay *itself* argued that wilderness designation
of Drakes Estero was not possible while the oyster farm's commercial
activities continued. Moreover, there are a variety of Park Service
management criteria that inform the question of what kinds of activities
are "consistent" with wilderness designation under the Wilderness Act.
The dissent's reliance on decades-old legislative pronouncements about
the Johnson oyster farm for the proposition that Section 124 was intended
to foreclose the Secretary from considering his department's own policies
with regard to Drakes Bay stretches even the most liberal use of legislative
history to the breaking point. "[U]nenacted approvals, beliefs, and desires
are not laws." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum
Corp.*, 485 U.S. 495, 501 (1988).

[6] This function is meaningful regardless of whether conflicting laws
actually prevented the Secretary from issuing a permit, a question the
dissent would answer in the negative, Dissent at 46, but which we simply
have no occasion to pass on here. The Department's legal position raised

potential legal impediments to the Secretary's authority with policy considerations that might lead the Department not to extend Drakes Bay's permit. Section 124 does not prescribe considerations on which the Secretary may or may not rely, it says nothing about the criteria for wilderness designation and says nothing about whether oyster farming is consistent with wilderness designation. As the Supreme Court has admonished, "courts have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point." *Shannon v. United States*, 512 U.S. 573, 584 (1994) (internal quotation marks and alteration omitted). Had Congress wanted to express a view on whether the Secretary should consider the Department's policies on wilderness or other criteria, it would have said so.[7] It did not, but rather gave the Secretary the discretion to decide.

We now turn to consideration of the Secretary's decision.

## II. PRELIMINARY INJUNCTION NOT WARRANTED

In seeking a preliminary injunction, Drakes Bay must establish "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of

---

a "*potential*[] conflict[]," *Novak*, 476 F.3d at 1046 (emphasis added), regarding the Department's authority, and the "notwithstanding clause" made clear that "other provisions of law" were not an impediment.

[7] Indeed, the only consideration that Congress addressed in Section 124 was that "[t]he Secretary shall take into consideration recommendations of the National Academy of Sciences Report pertaining to shellfish mariculture in Point Reyes National Seashore before *modifying* any terms and conditions of the extended authorization." (Emphasis added.) As modification of the permit is not at issue here, this provision is not relevant.

preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We have held that a "likelihood" of success per se is not an absolute requirement. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Rather, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. We review for abuse of discretion the district court's determination that Drakes Bay did not meet its burden under this test. *FTC v. Enforma Natural Products, Inc.*, 362 F.3d 1204, 1211–12 (9th Cir. 2004).

Drakes Bay contends that the Secretary misinterpreted his authority under Section 124 in that he mistakenly believed that granting a permit extension would violate other laws, that he failed to comply with NEPA, and that he failed to comply with federal rulemaking procedures. According to Drakes Bay, these errors render the Secretary's decision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the likelihood of success on the merits of these claims is too remote to justify the extraordinary remedy of a preliminary injunction. In light of our conclusion about the merits, we address only in passing the remaining preliminary injunction factors.

## A.  LIKELIHOOD OF SUCCESS ON THE MERITS

### 1.  The Import of Section 124

The Secretary's decision did not violate any statutory mandate, particularly the provision that gave him discretion to grant the permit despite any prior conflicting law.  The key portion of Section 124 provides as follows: "Prior to the expiration on November 30, 2012 of the Drakes Bay Oyster Company's Reservation of Use and Occupancy and associated special use permit ("existing authorization") within Drakes Estero at Point Reyes National Seashore, notwithstanding any other provision of law, the Secretary of the Interior is authorized to issue a special use permit . . . ."  Section 124 put the Secretary on notice that he was not hamstrung by other law should he determine a permit extension was appropriate.  The section left him free to consider wilderness values and the competing interests underlying a commercial operation in an area set aside as a natural seashore.

The narrow question that we have jurisdiction to review is whether the Secretary misinterpreted his authority under Section 124.  The record leaves no doubt that the answer is no.

As the Secretary explained, "SEC. 124 grants me the authority and discretion to issue [Drakes Bay] a new special use permit, but it does not direct me to do so."  The Secretary repeated this understanding multiple times throughout the decision, noting, for example, that Section 124 "does not dictate a result or constrain my discretion in this matter," and that it "grants me the authority to issue a new SUP."

Drakes Bay's view that the Secretary violated Section 124 rests on a misinterpretation of that provision and a misapprehension of the Secretary's reasoning. Drakes Bay first argues that the statute was intended to "make it easy" to issue the permit. As we explained above, this approach is wishful thinking, since the statute says nothing of the kind. Indeed, Congress first considered whether to mandate issuance of the permit but backed off that approach and ultimately left the decision to the Secretary's discretion. In the end, Congress did nothing more than let the Secretary know his hands were not tied.

Drakes Bay next argues that the Secretary erroneously concluded that extending the permit would "violate" applicable wilderness legislation. According to Drakes Bay, because Section 124 authorized the Secretary to extend the permit "notwithstanding any other provision of law," the Secretary was "prohibit[ed] . . . from relying on a violation of other law as a reason to justify a permit denial."

Drakes Bay's reading of the decision is not tenable. Taken as a whole, the decision reflects that the Secretary explicitly recognized that extending the permit would be lawful and that he was not legally constrained by other laws.

The Secretary elected to let the permit expire not to avoid "violating" any law, as Drakes Bay posits, but because the Secretary weighed and balanced competing concerns about the environment and the value of aquaculture. He chose to give weight to the *policies* underlying wilderness legislation, taking into account consideration of environmental impacts: "In addition to considering the [Drafted Environmental Impact Statement and Final Environmental Impact Statement], I gave *great weight to matters of public policy,*

*particularly the public policy inherent in the 1976 act* of Congress that identified Drakes Estero as potential wilderness." (Emphasis added).

Drakes Bay seizes on a single sentence in a summary of reasons as evidence that the Secretary thought extending the permit would "violate . . . specific wilderness legislation." At the beginning of the decision, the summary includes one sentence that, read in isolation, raises an ambiguity: "The continuation of the [Drakes Bay] operation would *violate the policies of NPS* concerning commercial use within a unit of the National Park System and nonconforming uses within potential or designated wilderness, *as well as specific wilderness legislation* for Point Reyes National Seashore." (Emphasis added). However, reading the sentence in context of the full decision, it is obvious the Secretary did not erroneously consider himself bound by any provision of wilderness legislation. In reviewing the agency's decision, we must uphold even "a decision of less than ideal clarity" so long as "the agency's path may reasonably be discerned." *FCC v. Fox Television Stations*, 556 U.S. 502, 513–14 (2009) (internal quotation marks omitted).

The Secretary's reliance on policy considerations and Congressional intent is evident throughout the decision. Recounting the factual and legal background, for example, the Secretary cited the House of Representatives committee report accompanying the Point Reyes Wilderness Act, which stated:

> As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible,

> with efforts to steadily continue to remove all
> obstacles to the eventual conversion of these
> lands and waters to wilderness status.

H.R. Rep. No. 94-1680 at 3.  The Secretary returned to this
committee report in his conclusion, explaining that:

> My decision honors Congress's direction to
> "steadily continue to remove all obstacles to
> the eventual conversion of these lands and
> waters to wilderness status" and thus ensures
> that these precious resources are preserved for
> the enjoyment of future generations of the
> American public, for whom Point Reyes
> National Seashore was created.

As expressed in his decision, his choice was consistent with
the draft and final environmental impact statements that
"support the proposition that the removal of [Drakes Bay's]
commercial operations in the estero would result in long-term
beneficial impacts to the estero's natural environment."

Drakes Bay suggests that referencing even the
Congressional "intent" or policies underlying the Point Reyes
Wilderness Act runs afoul of Section 124.  But as Drakes Bay
itself acknowledges, the "most natural, common-sense
reading" of the notwithstanding clause is "notwithstanding
any law that would *otherwise legally preclude issuance* of a
[special use permit], the Secretary has the *authority* to issue
a SUP."  It is abundantly clear that the Secretary recognized
his authority under Section 124 and did not believe he was
legally bound by any statute to deny the permit.  But the
policy that underlies the 1976 Act and other wilderness
legislation is just that—an expression of public policy.  These

expressions neither "legally preclude" nor legally mandate extension, and they are not "other provision[s] of law" that are swept aside by Section 124's "notwithstanding" clause. Statements in committee reports do not carry the force of law. *See Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993). "Congress's 'authoritative statement is the statutory text, not the legislative history.'" *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1980 (2011) (quoting *Exxon Mobil*, 545 U.S. at 568).

The Secretary's incorporation of the policies underlying wilderness legislation, and of Congressional intent as expressed in the House committee report, was a matter of his discretion. The Secretary noted correctly that "SEC. 124 . . . does not prescribe the factors on which I must base my decision." Section 124 "provides the court no way to second-guess the weight or priority to be assigned" to these factors. *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1535 (D.C. Cir. 1988) (concluding that agency decision to deny petition for enforcement was not reviewable where the governing regulations provided no standards to enable judicial review). The choice was the Secretary's to make.**[8]**

---

**[8]** The dissent's position that the agency "relied on factors which Congress has not intended it to consider," Dissent at 49, is not supported by the record. Under the deferential arbitrary and capricious standard, we uphold agency action for which a rational explanation is given, particularly where the agency "acted within the sphere of its expertise." *McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008). The Secretary's decision relied in general on "Congress's direction" to remove "obstacles" to wilderness designation. While the Wilderness Act bans commercial enterprise within wilderness areas "subject to existing private rights," 16 U.S.C. § 1133(c), Park Service policies inform whether wilderness designation is appropriate in the first instance. Contrary to the dissent's characterization, the 1976 legislation did not invoke a crystal ball and pass judgment on the compatibility of oyster farming in Drakes Estero

## 2. Drakes Bay's Other Statutory Arguments

As Section 124 affords no basis for us to review the substance of the Secretary's decision, we have no measuring stick against which to judge Drakes Bay's various claims that the Secretary's policy determination was mistaken. To the extent the Secretary's decision can be evaluated against the statutory requirements cited by Drakes Bay, Drakes Bay is unlikely to prevail in showing the decision was arbitrary and capricious, an abuse of discretion, or in violation of any law.

Drakes Bay argues that the Secretary violated the law by directing that Drakes Estero be designated as wilderness, because such a designation was not possible under the Wilderness Act in light of California's retained mineral and fishing rights. Although the Department of the Interior adopted this view in the past, the Department has since deemed that position inaccurate. The Wilderness Act itself nowhere provides that retained mineral or fishing rights preclude wilderness designation.[9] Drakes Bay is not likely to

---

with wilderness some thirty plus years later when the reservation of use would expire. Indeed, things change. The Secretary, drawing on the agency expertise amassed in the decades since the 1970s, concluded that continued oyster farming was inconsistent with wilderness criteria and the Department's policies. The Secretary's decision that removing the farm would further Congress's earlier expressed goal of moving toward wilderness designation was rational and within his authority under Section 124.

[9] Notably, the State of California takes the position that its retained rights, including the state constitutional right to fish, do not cover aquaculture. The California Department of Fish and Game criticized and rejected "brief, general, and conclusory" communications it made decades earlier that suggested the oyster farm was covered by the "right to fish" reservation. At present, the state has issued water bottom leases to Drakes

succeed on its theory that the Secretary's current position—that the permit's expiration enables wilderness designation despite retained mineral and fishing rights—amounted to "legal error."

Drakes Bay also believes that wilderness designation was improper in light of the "historic farming community" that remains on Drakes Estero. However, a 1978 amendment to the legislation establishing Point Reyes specifically authorizes the Park Service to lease property used for "agricultural, ranching, or dairying purposes." Act of Nov. 10, 1978, Pub. L. No. 95-625, § 318, 92 Stat. 3467, 3487. The Secretary's decision considered these uses a "compatible activity" within a wilderness area. Drakes Bay has not demonstrated how such a determination violates any restriction on the Secretary's authority.

On a related note, Drakes Bay charges that, in recounting the statutory history, the Secretary erred in stating that the 1978 amendment did not permit him to issue leases for mariculture. Drakes Bay's effort to shoehorn itself into an "agricultural purpose" is unavailing. Congress limited the Secretary's leasing authority to "lands" in Section 318(b) of the 1978 Act, rather than to the "lands, waters, and submerged lands" described in Section 318(a) of the same statute. *Id.* It is reasonable to assume this distinction is meaningful and reasonable for the Secretary to state that the Act did not authorize mariculture leases. Even if the Secretary misinterpreted this earlier law, he plainly

---

Bay for its commercial operations, but has made clear that the use of those leases past 2012 "is expressly contingent upon [Drakes Bay's] compliance with the 1972 grant reservation and, after its expiration, with any special use permit" that the federal government "may issue in its discretion."

understood that Section 124 did authorize him to issue Drakes Bay a permit for mariculture.  In sum, the Secretary neither violated any statutory mandate nor did he misapprehend his authority under the various statutes raised by Drakes Bay.

### 3.  Compliance with NEPA

We next address the applicability of NEPA to the Secretary's decision.  Under NEPA, an agency is required to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The government urges that its decision to let Drakes Bay's permit expire is not a "major Federal action[]," but rather is inaction that does not implicate NEPA.  Drakes Bay responds that the term "major Federal actions" includes failures to act, 40 C.F.R. § 1508.18, and that NEPA applies to decisions concerning whether to issue a permit.[10]

Here, the Secretary's decision to let Drakes Bay's permit expire according to its terms effectively "denied" Drakes Bay

---

[10] Drakes Bay argues that we cannot consider the government's inaction argument because the Secretary did not rely on that position in his decision.  We disagree.  "The rationale behind the *Chenery I* Court's refusal to accept belated justifications for agency action not previously asserted during the agency's own proceedings does not apply in this case. *Chenery I* was premised on the policy that courts should not substitute their judgment for that of the agency when reviewing a 'determination of *policy or judgment which the agency alone is authorized to make* and which it has not made.'"  *Louis v. U.S. Dep't of Labor*, 419 F.3d 970, 977–78 (9th Cir. 2005) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)) (emphasis added).  The "policy or judgment" call here was the Secretary's substantive decision whether to grant the permit.  We are not constrained in considering arguments concerning the applicability of NEPA.

a permit. We have held that "if a federal permit is a prerequisite for a project with adverse impact on the environment, *issuance* of that permit does constitute major federal action." *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) (emphasis added). But we have never held failure to grant a permit to the same standard, and for good reason. If agencies were required to produce an EIS every time they denied someone a license, the system would grind to a halt. Our case law makes clear that not every denial of a request to act is a "major Federal action." We have held, for example, that no EIS was required when the federal government denied a request to exercise its regulatory authority to stop a state's program killing wildlife. *State of Alaska v. Andrus*, 591 F.2d 537, 541 (9th Cir. 1979).

Drakes Bay suggested at oral argument that the Secretary's decision differs from typical inaction because it effected a change in the status quo, namely, the cessation of commercial operations that had previously been authorized. We are skeptical that the decision to allow the permit to expire after forty years, and thus to move toward designating Drakes Estero as wilderness, is a major action "significantly affecting the quality of the human environment" to which NEPA applies. 42 U.S.C. § 4332(2)(C). "The purpose of NEPA is to 'provide a mechanism to enhance or improve the environment and prevent further irreparable damage.'" *Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) (quoting *Pacific Legal Foundation v. Andrus*, 657 F.2d 829, 837 (6th Cir. 1981)).

The Secretary's decision is essentially an environmental conservation effort, which has not triggered NEPA in the past. For example, in *Douglas County*, we held NEPA did not apply to critical habitat designation under the Endangered

Species Act ("ESA") because it was "an action that prevent[ed] human interference with the environment" and "because the ESA *furthers the goals of NEPA* without demanding an EIS." *Id.* at 1505, 1506 (emphasis added). Because removing the oyster farm is a step toward restoring the "natural, untouched physical environment" and would prevent subsequent human interference in Drakes Estero, *id.* at 1505, the reasoning of *Douglas County* is persuasive here. The Secretary's decision to allow the permit to expire, just like the designation under the ESA, "protects the environment from exactly the kind of human impacts that NEPA is designed to foreclose." *Id.* at 1507.[11]

Drakes Bay also argued that removal of the oyster farm implicates NEPA because it has "adverse environmental consequences." Although the final EIS did note that removal might cause certain short-term harms, such as noise

---

[11] Drakes Bay noted at oral argument that we have recognized a circuit split on the question of "whether significant *beneficial* effects alone would trigger an EIS" and concluded in dicta that requiring an EIS in those circumstances was "consistent with the weight of circuit authority and has the virtue of reflecting the plain language of the statute." *Humane Society of U.S. v. Locke*, 626 F.3d 1040, 1056 n.9 (9th Cir. 2010) (citing cases) (emphasis added). The authority cited is not persuasive here, however, because none of those cases addressed environmental conservation efforts. The cases instead dealt with major federal construction projects to which NEPA applied in order to evaluate the positive effects asserted. *See Sierra Club v. Froehlke*, 816 F.2d 205, 211 n.3 (5th Cir. 1987) (major federal water project of Army Corps of Engineers); *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767, 783 (11th Cir. 1983) (construction of man-made lake); *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 993 (5th Cir. 1981) (major navigational project); *see also Natural Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1431 (D.C. Cir. 1985) (addressing energy-efficiency standards for household appliances and noting in dicta that "both beneficial and adverse effects on the environment can be significant within the meaning of NEPA").

associated with heavy machinery needed to remove Drakes Bay's structures, such relatively minor harms do not by themselves "significantly affect[]" the environment in such a way as to implicate NEPA.  42 U.S.C. § 4332(2)(C).  We are "reluctant . . . to make NEPA more of an obstructionist tactic to prevent environmental protection than it may already have become."  *Douglas County*, 48 F.3d at 1508 (internal quotation marks omitted).

Ultimately, we need not resolve whether NEPA compliance was required because, even if it was, the Secretary conducted an adequate NEPA review process and any claimed deficiencies are without consequence.  The government produced a lengthy EIS, which the Secretary considered and found "helpful."  Although the Secretary acknowledges that compliance with NEPA was less than perfect, Drakes Bay is unlikely to succeed in showing that the errors were prejudicial.  Relief is available under the APA only for "prejudicial error."  5 U.S.C. § 706; *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.") (internal quotation marks and citation omitted).

Drakes Bay points to "technical" violations, specifically, the Secretary's failure to publish the EIS more than thirty days before he made his decision and the Secretary's framing the extension denial in the form of a Decision Memorandum rather than a Record of Decision.  Drakes Bay has shown no prejudice from these claimed violations.  *See Nat'l Forest Pres. Grp. v. Butz*, 485 F.2d 408, 412 (9th Cir. 1973) (declining to reverse where NEPA timing and EIS requirements were not strictly followed but the agency "did consider environmental factors" and the "sterile exercise" of

forcing agency to reconsider "would serve no useful purpose"); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004) (declining to reverse based on violation of deadline for ESA biological assessment where no harm was shown).

Drakes Bay puts considerable stock in its claims that the final EIS was based on flawed science and that the absence of the thirty-day comment period denied it an opportunity to fully air its critique, specifically with regard to conclusions regarding the "soundscape" of the estero.[12] Nothing in the record suggests that Drakes Bay was prejudiced by any shortcomings in the final soundscape data. Drakes Bay sent the Secretary its scientific critique before he issued his decision. The Secretary specifically referenced that communication and stated that he did not rely on the "data that was asserted to be flawed." The Secretary was well

---

[12] Drakes Bay had submitted previous criticisms about the soundscape analysis, and related impacts on harbor seals, in its data quality complaint regarding the draft EIS. Although Drakes Bay did not raise the issue in its briefs, at oral argument it objected that the Secretary did not adequately respond to expert comments to the DEIS. In general, "on appeal, arguments not raised by a party in its opening brief are deemed waived." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). Regardless, we conclude the response to the DEIS was adequate. The Congressionally-mandated NAS report that criticized elements of the DEIS, including on these subjects, was brought to the Secretary's attention. The NAS report emphasized that the scientific literature on Drakes Estero was simply "not extensive" and that research on the impact of oyster farming was "even sparser." The take-away was that impact assessments for the soundscape and harbor seals were "considered to have a high level of uncertainty." The final EIS responded to the NAS critique and also addressed the scientific disputes. In particular, it added "a discussion on the strength of the underlying scientific data" to address the NAS's concerns about scientific uncertainty.

aware of the controversies on the specific topics that Drakes Bay criticizes and his statement was unambiguous that they did not carry weight in his decision. Drakes Bay's suggestion that the Secretary could not have made the informed decision that NEPA requires without resolving all controversies about the data is unsound. NEPA requires only that an EIS "contain[] a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993) (internal quotation marks and citation omitted). Drakes Bay is not likely to succeed in showing that the final EIS was inadequate, even assuming NEPA compliance was required.

### 4. Federal Register Notice

In light of the determination to let the permit expire, the Secretary directed the National Park Service to "publish in the Federal Register the notice announcing the conversion of Drakes Estero from potential to designated wilderness." Drakes Bay argues that the subsequently published notice was false because Drakes Bay's continued commercial activities (under the 90-day period the decision allowed to wrap up operations) and California's retained fishing and mineral rights precluded wilderness status. Drakes Bay also argues that the notice was issued in violation of formal rulemaking regulations.

Drakes Bay lacks standing to challenge the publication of the notice. Its claimed injury arises from the Secretary's decision to let its permit expire, not the designation in the notice. Drakes Bay cannot continue its operations without a permit, regardless of how the estero is designated. We disagree with Drakes Bay's position that it has standing because "it will be necessary to vacate the unlawful notice in

order for [Drakes Bay's] injuries to be ultimately redressed." Because Drakes Bay is not injured by the notice, it may not challenge the notice's purported falsity or the Secretary's compliance with rulemaking procedures.[13]

## B.  WEIGHING THE EQUITIES

Drakes Bay is not entitled to a preliminary injunction not only because it failed to raise a serious question about the Secretary's decision, but also because it has not shown that the balance of equities weighs in its favor. *Alliance for the Wild Rockies*, 632 F.3d at 1132. The district court found that, although Drakes Bay satisfied the irreparable harm prong of the preliminary injunction analysis, neither the public interest nor the equities were in its favor. When the government is a party, these last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Our review of the court's findings is for abuse of discretion, and we see none here.

---

[13] To the extent that Drakes Bay argues that the Secretary's decision was somehow tainted by the instruction that the Park Service publish the notice, the challenge still fails because the instruction was in accordance with the law. The notice was not false because, as we explained above, Drakes Estero could be designated "wilderness" despite California's reserved rights. Nor is the presence of temporary non-wilderness conditions an obstacle because Park Service policy permits a wilderness designation when "wilderness character could be . . . restored through appropriate management actions." In addition, although general regulations require rulemaking for certain use terminations, 36 C.F.R. § 1.5(b), the more specific section of 1976 legislation provided that conversion to wilderness would be automatic "upon publication in the Federal Register of a notice by the Secretary of the Interior that all uses thereon prohibited by the Wilderness Act . . . have ceased." 90 Stat. 2692.

The district court reasonably found that the public interest does not weigh in favor of injunctive relief. The public benefits both from the enjoyment of protected wilderness and of local oysters, and the court found no basis upon which to weigh these respective values. This factor does not tip to Drakes Bay.

Recognizing that Drakes Bay bears the burden in its quest for a preliminary injunction, the court's consideration of other equitable factors was also reasonable. Drakes Bay purchased the oyster farm with full disclosure, knowing that the reservation of use and occupancy was set to expire in 2012. The Department repeatedly warned the company that it did not plan to issue a new permit. Although the prospect of closing down a business is a serious hardship, the only reasonable expectation Drakes Bay could have had at the outset was that such a closure was very likely, if not certain. Closure remained a distinct possibility even after the passage of Section 124. Drakes Bay argued to the district court that it had "every reason to hope" for extension. But when parties "'anticipate[] a pro forma result' in permitting applications, they become 'largely responsible for their own harm.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002)). We see no reason to disturb the court's finding that the company's "refusal to hear the message" was an equitable factor weighing against it.

**AFFIRMED.**

WATFORD, Circuit Judge, dissenting:

The majority states that, by enacting § 124, "Congress did nothing more than let the Secretary know his hands were not tied." Maj. op. at 24. I think Congress, by including the "notwithstanding" clause in § 124, intended to do more than that. In particular, it sought to override the Department of the Interior's misinterpretation of the Point Reyes Wilderness Act, Pub. L. No. 94-544, 90 Stat. 2515 (1976).

The Department had concluded, in 2005, that the Act barred issuance of a special use permit authorizing continued operation of Drakes Bay Oyster Company's oyster farm. The Department thought Congress had "mandated" that result by designating Drakes Estero, where the oyster farm is located, as a "potential wilderness addition" in the Point Reyes Wilderness Act. The Act's legislative history makes clear, however, that by divining such a mandate, the Department simply misinterpreted the Act's provisions and misconstrued Congress's intent. The Department's misinterpretation of the Point Reyes Wilderness Act prompted Congress to enact § 124 in 2009. In my view, by including a notwithstanding clause in § 124, Congress attempted to supersede the Department's erroneous interpretation of the Act.

In the 2012 decision challenged here, the Secretary nonetheless denied Drakes Bay's permit request based primarily on the very same misinterpretation of the Point Reyes Wilderness Act that Congress thought it had overridden. As a result, I think Drakes Bay is likely to prevail on its claim that the Secretary's decision is arbitrary, capricious, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). Because the other preliminary injunction factors also weigh in Drakes Bay's favor,

injunctive relief preserving the status quo should have been granted here.

I

To explain why I think the Interior Department (and later the Secretary) misinterpreted the Point Reyes Wilderness Act, a fairly detailed discussion of the Act's legislative history is necessary.

The events leading up to passage of the Point Reyes Wilderness Act begin in 1962, when Congress authorized creation of the Point Reyes National Seashore and appropriated funds for land acquisition within the Seashore's designated boundaries. Act of Sept. 13, 1962, Pub. L. No. 87-657, 76 Stat. 538 (1962). As part of that process, in 1965, the State of California conveyed ownership of the submerged lands and coastal tidelands within the Seashore's boundaries to the federal government. *See* Act of July 9, 1965, ch. 983, § 1, 1965 Cal. Stat. 2604, 2604. Those lands included Drakes Estero. The conveyance reserved certain mineral and fishing rights, which allowed the State to "prospect for, mine, and remove [mineral] deposits from the lands," and "reserved to the people of the state the right to fish in the waters underlying the lands." *Id.* §§ 2–3, 1965 Cal. Stat. at 2605. At the time of the State's conveyance, oyster farming was already a well-established fixture in Drakes Estero, with roots dating back to the 1930s.

In 1973, the President recommended that Congress preserve 10,600 acres within the Point Reyes National Seashore as "wilderness," under the terms of the Wilderness Act of 1964, Pub. L. No. 88-577, § 3(c), 78 Stat. 890, 892 (1964). Members of California's congressional delegation

found that recommendation woefully inadequate, and soon thereafter introduced identical bills in the House and Senate designating far larger areas of the Seashore as wilderness. In the House, Congressman John Burton introduced H.R. 8002, 94th Cong. (1975); in the Senate, Senator John Tunney introduced S. 2472, 94th Cong. (1975). H.R. 8002 is the bill that eventually became the Point Reyes Wilderness Act.

As originally proposed, H.R. 8002 and S. 2472 would have designated more than thirty-eight thousand acres as wilderness. Included within that designation was Drakes Estero, as well as most of the other submerged lands and coastal tidelands conveyed by California in 1965. The sponsors of H.R. 8002 and S. 2472 were well aware of the oyster farm in Drakes Estero. They nonetheless included Drakes Estero within the wilderness designation because they did not view the farm's operations as incompatible with the area's wilderness status. Commenting on the Senate bill, Senator Tunney left no doubt on that score, declaring, "Established private rights of landowners and leaseholders will continue to be respected and protected. The existing agricultural and aquacultural uses can continue." *Wilderness Additions—National Park System: Hearings Before the Subcomm. on Parks and Recreation of the S. Comm. on Interior and Insular Affairs*, 94th Cong. 271 (1976) [hereinafter *Senate Hearing*].

During hearings on H.R. 8002 and S. 2472, various civic, environmental, and conservation groups supported Drakes Estero's designation as wilderness. They explained in detail why neither the State's reserved mineral and fishing rights nor the oyster farm precluded such a designation. No one advocating Drakes Estero's designation as wilderness suggested that the oyster farm needed to be removed before

the area could become wilderness.  *See id.* at 324–33, 344–61; *H.R. 7198, H.R. 8002, et al., To Designate Certain Lands in the Point Reyes National Seashore, California as Wilderness: Hearing Before Subcomm. on Nat'l Parks and Recreation of the H. Comm. on Interior and Insular Affairs*, 94th Cong. (1976) [hereinafter *House Hearing*], prepared statements of Jim Eaton, William J. Duddleson, Ms. Raye-Page, and Frank C. Boerger.

The comments Congress received from those who were advocating Drakes Estero's designation as wilderness stressed a common theme: that the oyster farm was a beneficial pre-existing use that should be allowed to continue notwithstanding the area's designation as wilderness.  For example, a representative from the Wilderness Society stated: "Within Drakes Estero the oyster culture activity, which is under lease, has a minimal environmental and visual intrusion.  Its continuation is permissible as a pre-existing non-conforming use and is not a deterrent for inclusion of the federally owned submerged lands of the Estero in wilderness." *House Hearing*, prepared statement of Ms. Raye-Page, at 6.  The Chairman of the Golden Gate National Recreation Area Citizens' Advisory Commission noted that the oyster-farming operations "presently carried on within the seashore existed prior to its establishment as a park and have since been considered desirable by both the public and park managers." *Senate Hearing*, at 361.  He therefore recommended that specific provision be made to allow such operations "to continue unrestrained by wilderness designation." *Id.*  Others observed, echoing the comments of Senator Tunney, that the proposed House and Senate bills already provided for that.  *See House Hearing*, prepared statement of William J. Duddleson, at 3–4 ("H.R. 8002 would allow continued use and operation of Johnson's Oyster

Company at Drakes Estero, as a pre-existing non-conforming use."); *Senate Hearing*, at 357 ("S. 2472 would allow the continued use and operation of Johnson's Oyster Company in Drakes Estero."). A local state assemblyman succinctly summed it up this way: "Finally, I believe everyone concerned supports the continued operation of oyster farming in Drakes Estero as a non-conforming use." *Senate Hearing*, at 356.

The view expressed by these speakers—that continued operation of the oyster farm was fully compatible with Drakes Estero's designation as wilderness —was not some wild-eyed notion. It was firmly grounded in the text of the Wilderness Act itself. The Act generally bans commercial enterprise within wilderness areas, but does so "subject to existing private rights." 16 U.S.C. § 1133(c). Drakes Bay's predecessor, the Johnson Oyster Company, had existing private rights in the form of water-bottom leases issued by California that pre-dated both the passage of the Wilderness Act and creation of the Point Reyes National Seashore. The Act also generally prohibits the use of motorboats within wilderness areas, *see id.*, but the Secretary of Agriculture may permit continued use of motorboats when, as here, such use has "already become established." *Id.* § 1133(d)(1). To the extent there is any ambiguity in these provisions, the Act's legislative history makes clear that Congress believed the new wilderness-preservation system would not affect the economic arrangements of business enterprises "because existing private rights and established uses are permitted to continue." S. Rep. No. 88-109, at 2 (1963).

The only party opposed to designating Drakes Estero as wilderness was the Department of the Interior. At first, the Department took the position that none of the submerged

lands and coastal tidelands conveyed by California in 1965 could be designated as wilderness, because the State's reserved mineral and fishing rights were "inconsistent with wilderness." *House Hearing*, letter from John Kyl, Assistant Secretary of the Interior, at 3. When the Department's view came under attack by those who argued that the State's reserved rights were not in any way inconsistent with wilderness, *see, e.g.*, *Senate Hearing*, at 327–28, the Department backpedaled. It proposed placing most of the lands subject to the State's reserved rights into a new legislative classification—"potential wilderness addition"— which it had developed in connection with similar wilderness proposals. *See House Hearing*, at 11–12; *id.*, letter from John Kyl, Assistant Secretary of the Interior, at 1. That designation was intended to encompass "lands which are essentially of wilderness character, but retain sufficient non-conforming structures, activities, uses or private rights so as to preclude immediate wilderness classification." S. Rep. No. 94-1357, at 3 (1976).

Four areas subject to the State's reserved rights were at issue: the coastal tidelands, Limantour Estero, Abbotts Lagoon, and Drakes Estero. The original version of H.R. 8002 designated all four areas as wilderness, not just potential wilderness additions. But in the spirit of compromise, Congressman Burton, the sponsor of H.R. 8002, agreed to amend the bill by designating those areas as potential wilderness additions, rather than as wilderness. *See House Hearing*, prepared statement of Rep. John Burton, at 2. In doing so, he made clear that all four areas were being designated as potential wilderness additions due to California's reserved mineral and fishing rights. *See id.* He noted that, "[a]s 'potential wilderness,' these areas would be designated as wilderness *effective when the State ceeds [*sic]

*these rights to the United States*." *Id.* (emphasis added). As so amended, H.R. 8002 was enacted as the Point Reyes Wilderness Act in 1976.

Fast forward now to 2005. Shortly before Drakes Bay's purchase of the oyster farm closed, the Park Service reiterated its view that, based on a legal analysis performed by the Interior Department, no new permits authorizing oyster farming in Drakes Estero could be issued. The Department's legal analysis concluded—bizarrely, given the legislative history recounted above—that by designating Drakes Estero as a potential wilderness addition in the Point Reyes Wilderness Act, Congress had "mandated" elimination of the oyster farm. The Department never identified anything in the text of the Act to support that view; it cited only a passage from the House Report accompanying H.R. 8002. But that passage "is in no way anchored in the text of the statute," *Shannon v. United States*, 512 U.S. 573, 583–84 (1994), and thus provides no support for the Department's interpretation of the Act.

Even taken on its own terms, however, the passage from the House Report does not support the Department's interpretation. The passage states in full: "As is well established, it is the intention that those lands and waters designated as potential wilderness additions will be essentially managed as wilderness, to the extent possible, *with efforts to steadily continue to remove all obstacles to the eventual conversion of these lands and waters to wilderness status*." H.R. Rep. No. 94-1680, at 3 (1976) (emphasis added). But the oyster farm was not an "obstacle" to Drakes Estero's conversion to wilderness status, and no one in Congress ever expressed that view. To the contrary, as discussed above, all indications are that Congress viewed the

oyster farm as a beneficial, pre-existing use whose continuation was fully compatible with wilderness status.

## II

With that background in mind, we can now turn to the legal issue at the heart of this appeal, which is how to construe § 124.

Everyone appears to agree that the Park Service's conclusion in 2005 that it was legally prohibited from granting Drakes Bay a special use permit prompted Congress to enact § 124. If all Congress had wanted to do was "let the Secretary know his hands were not tied," as the majority asserts, § 124 could simply have stated, as it does, that "the Secretary of the Interior is authorized to issue a special use permit . . . ." Act of Oct. 30, 2009, Pub. L. No. 111-88, § 124, 123 Stat. 2904, 2932. But Congress went further and added a notwithstanding clause, so that the statute as enacted reads, "*notwithstanding any other provision of law*, the Secretary of the Interior is authorized to issue a special use permit . . . ." *Id.* (emphasis added). Our task is to determine what effect Congress intended the notwithstanding clause to have.

Given the historical backdrop against which § 124 was enacted, I think Congress intended the clause to override the Interior Department's misinterpretation of the Point Reyes Wilderness Act. Reading the clause in that fashion is consistent with the way courts have typically construed notwithstanding clauses. The Supreme Court has held that the use of such a clause "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v.*

*Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). And we have said that the basic function of such clauses is to "sweep aside" and "supersede" any potentially conflicting laws. *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc); *Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1166 (9th Cir. 2001). A notwithstanding clause often targets those laws that were the "legal sticking point" for the action Congress intends to authorize. *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1301 n.19 (11th Cir. 2010).

In this case, no conflicting laws actually prevented the Secretary from issuing a permit to Drakes Bay. Continued operation of the oyster farm is fully consistent with the Wilderness Act, and the farm's existence is therefore not an "obstacle" to converting Drakes Estero to wilderness status as directed by the Point Reyes Wilderness Act. Instead, it was the Interior Department's *misinterpretation* of the Point Reyes Wilderness Act that proved to be the "legal sticking point" here. I think the best reading of the notwithstanding clause is that Congress meant to "override" ("sweep aside," "supersede") that misinterpretation of the law when it enacted § 124. *Alpine Ridge Grp.*, 508 U.S. at 18; *Novak*, 476 F.3d at 1046; *Student Loan Fund*, 272 F.3d at 1166.

If you accept what I have said so far, only two questions remain. The first is whether Congress, having overridden the Department's misinterpretation of the Point Reyes Wilderness Act, nonetheless authorized the Secretary to rely on that misinterpretation as a basis for denying Drakes Bay a permit. I cannot see any reason why we would construe § 124 in that fashion. Under the Administrative Procedure Act (APA), if an agency bases its decision on a legally erroneous interpretation of the controlling statute, its decision

will be deemed arbitrary, capricious, or otherwise not in accordance with law. *See Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091, 1101 (9th Cir. 2007) (involving an erroneous interpretation of a state implementation plan that had the force and effect of federal law). Thus, even without the notwithstanding clause, it would make no sense to assume that Congress authorized the Secretary to base his decision on a misinterpretation of the Point Reyes Wilderness Act. With the clause, adopting any such construction of § 124 would be entirely indefensible.

The second (and admittedly closer) question is whether the Secretary in fact based his decision on the misinterpretation of the Act that Congress intended to override by enacting § 124. The majority suggests that the Secretary based his decision instead on the Interior Department's own policies, *see* Maj. op. at 20 & n.5, 27–28 n.8, but I do not think the Secretary's written decision denying the permit supports that view. The Secretary's decision states that he gave "great weight" to what he called "the public policy inherent in the 1976 act of Congress that identified Drakes Estero as potential wilderness." The Secretary read that Act as expressing Congress's intention that all "obstacles" to converting Drakes Estero to wilderness status should be removed. But he erroneously deemed the oyster farm to be such an obstacle ("DBOC's commercial operations are the only use preventing the conversion of Drakes Estero to designated wilderness"), because he erroneously assumed that the oyster farm's continued operation was "prohibited by the Wilderness Act." That in turn led him to conclude— again erroneously—that his decision to eliminate the oyster farm "effectuate[d]" Congress's intent as expressed in the Point Reyes Wilderness Act.

These are precisely the same errors of statutory interpretation the Interior Department made back in 2005. They are precisely the same errors that prompted Congress to enact § 124 in the first place. And, in my view, they are precisely the same errors Congress attempted to supersede by inserting the notwithstanding clause. Contrary to the majority's assertion, the Secretary had no authority to rely on this misinterpretation of "Congress's earlier expressed goal" because the notwithstanding clause eliminated any such authority. *See* Maj. op. at 27–28 n.8.

What does the majority offer in response to this analysis? Some hand waving, to be sure, but nothing of any substance. Most tellingly, the majority never attempts to argue that the Interior Department's interpretation of the Point Reyes Wilderness Act was *correct*. Nor could it make that argument with a straight face given the Act's clear legislative history, which the majority never attempts to address, much less refute. The majority thus has no explanation for Congress's inclusion of the notwithstanding clause in § 124 other than the one I have offered: that it was included to override the Department's misinterpretation of the Point Reyes Wilderness Act. The majority claims that the clause "has a clear function—to convey that prior legislation should not be deemed a legal barrier" to permit issuance. *See* Maj. op. at 20. But that reading of the clause *supports* my position because the Secretary did treat "prior legislation"—namely, the Point Reyes Wilderness Act—as a "legal barrier" to permit issuance. As I have argued, that is exactly what the notwithstanding clause was intended to prohibit.

The majority also claims that I have not accorded the Secretary's decision the deference it is owed under the arbitrary and capricious standard, which requires us to give

due regard to an agency's exercise of discretion within its sphere of expertise. *See* Maj. op. at 27–28 n.8. But I am not arguing here that the Secretary's decision must be set aside because it reflects faulty weighing of permissible policy factors. We would have no authority to second guess a decision of that order. What I am saying, instead, is that § 124's notwithstanding clause precluded the Secretary from basing his decision on the very misinterpretation of the Point Reyes Wilderness Act that Congress intended to override. A decision will normally be deemed arbitrary and capricious if an agency "has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That, unfortunately, is just what the Secretary did.

In short, I would hold that Drakes Bay is likely to prevail on the merits of its APA claim. The Secretary's misinterpretation of the Point Reyes Wilderness Act, and his mistaken view that denying the permit request effectuated *Congress's* intent, were "fundamental" to his decision, rendering the decision "arbitrary, capricious, or otherwise not in accordance with law." *Safe Air for Everyone*, 488 F.3d at 1101 (internal quotation marks omitted).

### III

Like the majority, I will not spend much time addressing the remaining preliminary injunction factors—irreparable harm, balance of the equities, and the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Considered together, those factors tip in Drakes Bay's favor.

Drakes Bay will suffer irreparable injury to its business and real-property rights if a preliminary injunction is erroneously denied.  *See, e.g.*, *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).  The loss of "an ongoing business representing many years of effort and the livelihood of its [owners] constitutes irreparable harm."  *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam).

The balance of equities favors Drakes Bay.  The majority concludes otherwise by noting that Drakes Bay knew when it acquired the oyster farm that its permit would expire in 2012.  Maj. op. at 37.  But that is not the relevant consideration.  Rather, the controlling consideration is that the harm Drakes Bay will suffer from the erroneous denial of a preliminary injunction far outweighs the harm the government will suffer from an erroneous grant of such relief.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137–38 (9th Cir. 2011); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002); *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986); *Roso-Lino*, 749 F.2d at 126.  The government will suffer only modest harm if oyster farming's eighty-year history in the Estero continues a bit longer.  But if a preliminary injunction is erroneously denied, Drakes Bay's business will be destroyed.  That is all Drakes Bay must show to demonstrate that the balance of equities tips in its favor here.

Finally, the public interest favors neither side.  As the district court observed, federal judges are ill equipped to weigh the adverse environmental consequences of denying a preliminary injunction against the consequences of granting

such relief, or the relative interests in access to Drakes Bay's oysters as opposed to unencumbered wilderness.  It is the equities that carry the day in this case, *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (when the United States is a party, equities and the public interest merge), and the equities strongly favor Drakes Bay.